OPINION OF THE COURT
Jeremiah J. Moriarty, J.
Claimant seeks to recover damages from the State for the wrongful death of her husband, as well as for the conscious pain and suffering he sustained prior to his death. The claim *286 was timely filed, and has not been assigned or previously submitted.
The facts are not seriously in dispute. On June 19, 1967, Andrew Klee was employed as a laborer by Secord Bros., Inc., and in the course of his employment on that date, he sustained bodily injuries which resulted in his immediate death, caused by the cave-in of a trench in which he was working.
Secord Bros, as engaged, under contract, by the Erie County Water Authority to install a 20-inch transmission line along the north side of Jewett Holmwood Road, from Chestnut Ridge Road to a point 500 feet west of Timber lake Drive, Town of Orchard Park. Construction began at the westerly terminus of the project, at or near the intersection of Chestnut Ridge Road and Jewett Holmwood Road, and proceeded easterly.
Essentially, the construction entailed the excavation of a trench to a predetermined depth, into which 20-foot sections of the water main were placed. The excavation was accomplished by a power shovel with a 36-inch bucket. The length of the trench was limited to approximately 20 feet at any one time, so that a section of the pipe was lowered into the trench by cable, joined with the previously laid line, and then the trench was back filled before another was started.
This operation was in progress on the date of the accident. Testimony of coworkers of the decedent clearly establishes that no safeguards had been taken, on this day at least, to protect the excavation from a cave-in. In fact, this testimony establishes that cave-ins on the project were commonplace, and that the workers, including the decedent, ignored these conditions in the interest of remaining employed. The contractor employer made it clear "if you do not want to do the work —go home.”, said the witness David McAnulty, sworn by the claimant.
The alleged negligence of the State is couched in the following terms in both the claim and the bill of particulars. "On information and belief, the state of new york was careless and negligent in that its inspectors, officers, agents and employees were aware of the continuous, dangerous and hazardous methods used and the various violations of the Labor Law in the construction of said sewer line, yet they permitted the operation and construction to continue. They failed to properly and adequately stop the construction of said sewer line; failed to properly post signs and warning devices alerting *287 people on the said project as to the dangerous conditions; failed to properly and adequately inspect said job and was otherwise careless and negligent.”
At the date of the accident section 241 of article 10 of the Labor Law specifically dealt with excavation work, and provided: "All areas, buildings or structures in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted by the owners, contractors, and subcontractors as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The board may make rules to carry into effect the provisions of this section.”
The board referred to in the statute is the Board of Standards and Appeals of the State of New York, Industrial Code Rule No. 23 (12 NYCRR Part 23), Protection of Persons Employed in Construction and Demolition Work, was adopted by the Board of Standards and Appeals. The pertinent parts of the rule are found in section 23.8: "Excavation, (a) Stability of structures. Where there is any question of stability of structures adjoining or over areas to be excavated, such structures shall be supported where necessary by underpinning, sheet piling, shoring, bracing or other means to prevent injury to any employee, (b) General requirements. (1) No employee shall be permitted to enter any excavated area unless sheet piling, shoring or other safeguard that may be necessary for his protection is provided. (2) Where any employee in an excavation is exposed to the hazard of falling or sliding material from any bank or side more than five feet high above his footing, adequate piling and bracing shall be provided against the bank or side to eliminate such hazard. The excavation shall be checked after every rain storm or other hazard-increasing occurrence and the protection against slides and cave-ins increased if necessary.”
By section 21 of the Labor Law, the Industrial Commissioner is charged with the enforcement of the provisions of the Labor Law and of the Industrial Code, and subdivision 2 of that section provides: "[the Industrial Commissioner] 2. Shall cause proper inspections to be made of all matters prescribed by this chapter or by the industrial code”.
Section 200 of the Labor Law empowers the commissioner, if he finds any place violating these requirements to be in a dangerous condition, to post a notice in the area warning *288 persons of the danger. This notice shall prohibit further work in the area until the dangerous condition is corrected and the notice removed.
It is not clear in this record how, or when, the inspection process is initiated in a project such as we have in this situation. In any event, the construction safety inspector for the area, employed by the Department of Labor, learned of it and first visited the site on March 27, 1967. This inspector, Joseph F. Peacock (now retired), entered the employ of the State in 1957. He brought with him a background as a construction foreman in general construction for a period of 11 years, this preceded by other employment and military service. We consider him to be qualified for his duties.
The project had not been started on March 27, 1967; he made further inspections on April 3, April 7, and April 20, 1967, to find nothing had been started. His next inspection was May 26, 1967, at which time he found that work was in progress. His examination revealed an 8-foot deep excavation which was in violation of the code rule. He did not recall, and we do not know, why he made this particular visit to the job site; his best explanation was that it was his routine when he was in the area concerning several other jobs he was carrying, generally 50 in number.
Observing the violation on the morning of May 26, he "tagged the job — shut the job down — nobody works.” On the site, he was in conversation with a member of the Secord family, whom he knew and recognized from other projects of the Secord Bros., and explained the problem. There were no workmen in the trench in the morning. Peacock returned the same afternoon to find no workmen present, that nothing had been done to correct the violation, so he left the tag where it had been placed, and informed Secord he would return on Monday, May 29, warning that no work was to continue until the tag was removed.
Returning on the morning of May 29, he engaged in further conversation with Mr. Secord who asked him what he wanted him to do. Peacock testified he advised the excavation and/or trench had to be protected from a cave-in and outlined the various alternatives set forth in the code rule, that is either by shoring or sloping. Mr. Secord personally operated the equipment that was present and achieved what Mr. Peacock termed a "one on one slope” which he considered to be adequate and safe, and approved. It was his testimony that he *289 further advised Mr. Secord that if this sort of precaution extended throughout the remainder of the job, there would be no further difficulty with violations; however, he did not restrict precautionary measures to sloping.
In the performance of his duties, Mr. Peacock periodically inspected this site to see if it remained in compliance. He returned again on June 7, 1967 to find that there was no excavation in progress on that date, because the project had reached a creek or stream and the work crew was in the process of building a retaining wall at that location. It was his conclusion that whatever work was in progress was in compliance, that there were no violations, because he did not "tag” the job at that point.
There was no further inspection after June 7 or prior to June 19, 1967, the date of the accident. The inspector made an inspection on June 20, 1967, and completed and filed with his office a standard accident report to the effect that at the time of the accident, no bracing or shoring was present in the trench excavation.
The foregoing facts establishing the involvement of the State of New York with this project are not in dispute. The person with whom Mr. Peacock communicated on his inspections of the project was one Henry Secord, whom he identified as one of the Secord Brothers, and the Superintendent on the job. It developed on the trial that Henry Secord was presently a resident of the Western New York area, the State reported it made serious effort, short of subpoena, to produce Mr. Secord but he did not appear. He was the only person who could have disputed the nature and the extent of the State’s involvement in the matter.
The testimony of the coworkers of the decedent, who were sworn by the claimant, definitely established that there were no precautions taken at the point of the accident to prevent a cave-in of the trench. This testimony further confirmed that cave-ins were commonplace and occurred frequently while the project was in progress, from the point of its inception to the point of the accident. There is absolutely no indication, from the testimony, by inference, or otherwise, that the decedent, his coworkers, union representatives, or anyone, made a complaint to the authorities concerning these working conditions.
Claimant’s counsel, on the trial, made a concentrated and successful effort to establish that much of the construction was immediately adjacent to the northerly edge of Jewett *290 Holmwood Road, and that at no point was the pavement of the highway disturbed. However, we have no direct evidence as to the proximity of the area in which the inspector approved one on one sloping, to the paved edge of the road. Claimant’s case is based in large part on this demonstration, to indicate that sloping was not a feasible safety precaution. Crucial to this theory is proof that the inspector ordered sloping as the exclusive, acceptable method for making the trench safe. The evidence is in contradiction to this theory, the unrefuted testimony of Mr. Peacock is that he told Mr. Secord that sloping was only one of several acceptable methods of compliance with the code rule. We believe his testimony in this regard, and also find that Mr. Peacock performed his duty when he found a violation, by enforcing the applicable code rule in a proper manner.
The claimant would further impose liability upon the State for failure to carry out a statutory function, and for failure to inspect the project more frequently.
Prior to the general waiver of sovereign immunity contained in section 8 of the Court of Claim’s Act, it was the law in New York that the State was liable for the negligence of its agents in pursuing a proprietary function; but not liable for failure to exercise a governmental function, such as providing adequate police or fire protection. (See Steitz v City of Beacon, 295 NY 51.)
Notwithstanding the State’s waiver of sovereign immunity, it is still the law in New York that there is no liability for failure to perform a purely governmental function. Similarly, there is no municipal or State liability for an inspector’s failure to discover a violation (Young v State of New York, 278 App Div 997, affd 304 NY 677).
In his strongly worded dissent in Motyka v City of Amsterdam (15 NY2d 134), Chief Judge Desmond pointed up the numerous exceptions and interpretations of the general rule we have stated. The exceptions seem to be where the rule or regulation involved redounded to the particular and specific benefit of the person injured and for that reason, its nonobservance predicated liability for injuries sustained thereby.
Both sides have brought to our attention the decision in Metildi v State of New York (177 Misc 179). There, the Court of Claims found a specific duty of inspection running to the benefit of a specific class of workmen. The court reached this conclusion after considering article 10 of the Labor Law then *291 in effect, entitled "Building Construction, Demolition and Repair Work”, particularly subdivision 4 of section 240 which provided that upon a complaint (emphasis added), the commissioner must certify that an inspection has been made and that the scaffold is safe, or unsafe, as the case may be. To us, this decision simply stands for the proposition that when the State has specific knowledge of a dangerous condition, in that situation, a complaint about scaffolds, then a specific duty arises to protect those using scaffolds.
In the recent decision in Smullen v City of New York (28 NY2d 66) the Court of Appeals reviewed the question of municipal liability in an excavation-inspection situation. There, a City of New York inspector told an employee of an excavation subcontractor that a particular trench appeared to be safe and did not need shoring. Immediately thereafter, and in the presence of the inspector, the employee entered the trench and a cave-in took his life. The Court of Appeals found liability based on a theory of assumption of control and direction over the job by the inspector. The court considered and distinguished, the long-standing case law of governmental nonliability for failure to inspect. The inspector in Smullen by his actions had created a special relationship with a concomitant duty beyond any statutory requirement to perform an inspection.
Notwithstanding the result in Smullen, it reaffirmed the principle that mere failure to perceive a violation, standing alone, cannot give rise to a cause of action in negligence.
Another exception or interpretation of the general rule of nonliability for failure to perform a governmental function exists where there is an "inherently dangerous instrumentality” over which the State of New York or a municipal body has some supervisory control. An invocation of this theory requires the statutory duty to inspect, coupled with specific knowledge that there exists an inherently dangerous situation. In Runkel v City of New York (282 App Div 173, 175-176) there existed a dilapidated, rotted structure which was identified as such by a building inspector subsequent to his inspection. The inspector reported to his superior that the building was " 'dangerous or unsafe structurally or as a fire hazard’ ” and " 'must be taken down or removed, or made safe and secure’ ”, or " '[p]roperly repair, * * * or demolish building at once.’ ”
While there was a recovery in Runkel and the case involved *292 a statutory duty (Multiple Dwelling Law, § 309) to inspect, the court did not base liability solely on the failure to order demolition of the building prior to the occurrence of any accident. A close scrutiny of the opinion reveals that the court drew upon all the facts and circumstances, and concluded that there was a specific duty which had arisen for the benefit of the injured person seeking to recover. Totality of the facts methodology, coupled with the court’s finding that the structure was inherently dangerous, and as such in the same class as "an explosive substance, inflammable material, [or] a live electric wire” (282 App Div 176), leads us to leave unquestioned the Court of Appeals observation in Smullen v City of New York (28 NY2d 66, supra), wherein that court characterized the Runkel situation simply as a municipal liability based on the statutory duty, knowledge and foreseeability because of the inherently dangerous situation.
It appears from the foregoing that unless a violation of an inspection statute is accompanied by some other common-law basis for tort liability, there can be no recovery.
In Schuster v City of New York (5 NY2d 75) a police informer, who repeatedly notified police of his belief he was in danger, was, in fact, eventually murdered. His estate sued on the theory of inadequate police protection. In its decision, the Court of Appeals concluded (pp 80-81) that the public indeed owes a "special duty to use reasonable care for the protection of persons who have collaborated with it in the arrest or prosecution of criminals, once it reasonably appears that they are in danger due to their collaboration”. We cite the Schuster case only because the court acknowledged the general rule of nonliability for the nonperformance of governmental functions, in that case, police protection. However, based on all the facts presented to them, they were able to find a specific duty running from the public at large to the citizen who came forward and assisted in law enforcement. This so-called "special relationship” between the individual killed and the public is quite relevant to our deliberations in this matter.
Considering the provisions of the Labor Law and the Industrial Code we find to be applicable to this claim, we are not convinced that they contain any language or provisions supporting an analogy to either Runkel (282 App Div 173, supra) or Metildi (177 Misc 179, supra), for there was a common-law basis for liability in the former, and in the latter, a specific complaint procedure spelled out by statute.
*293 We further observe that the language providing for an inspection and posting of an unsafe job are similar to the statute involved in Smullen v City of New York (supra), where it was held that the statute alone was insufficient to cast the city in damages. (See, also, Heiston v State of New York, 189 NYS2d 225.)
In considering the question of more frequent monitoring of the job site, we repeat that the operation was such that it was a continuous ongoing series of approximately 20-foot excavations which were begun and terminated on an individual basis. We have cited Young v State (278 App Div 997, affd 304 NY 677, supra) in another connection, but now review it on its applicability in this area.
In Young, the claimant, a bridge painter, was injured when he fell from a scaffold maintained by his employer. It was alleged that his injury was caused by an unsafe scaffold in violation of requirements of the Labor Law, and the rules promulgated in the Industrial Code. Several days before the accident, an inspector of the Department of Labor visited the work site, discovered a violation of the Labor Law, which he reported, and issued an order for its correction.
The court wrote (p 997): "There is no proof that the State or any of its officers or employees knew of the different and subsequent violation of the Labor Law by the painting subcontractor, and which may be said to have later contributed to said claimant’s fall. There is no evidence that any complaint of that violation ever reached the Industrial Commissioner or the Department of Labor. (Labor Law, § 240, subd. 4.) Basically, the appellant’s contention for the State’s liability in tort is that its appropriate officers and agents were negligent in failing to so police or inspect and supervise the work of the subcontractor as to have prevented the Labor Law violation which was a cause of accidental injury to claimant Young. Neither by statute nor principle of substantive law has so onerous and general a burden and responsibility been cast upon the State. The record is barren of any evidence to support a ñnding of actionable wrong on the part of any of its officers or employees under the provisions of the statute (Court of Claims Act, §§ 8, 9, subd. 2). ” (Emphasis supplied.)
This was an unfortunate and tragic accident, and in all probability, totally avoidable. This court has carefully reviewed all the testimoiiy, carefully considered the theories advanced by the claimant, as well as all the authorities cited *294 in support thereof. Sympathetic as we are to the claimant and her family, testing the evidence presented against the applicable rules of law forces us to the conclusion that the claimant cannot prevail.
The State’s motion to dismiss the claim made at the close of the trial, and on which the court reversed decision, is now granted.