*693 OPINION OF THE COURT
Frank S. Rossetti, J.
This claim is for damages arising from personal injuries sustained by Spyros Kalofonos when he fell from a scaffold while working on a State-owned bridge in Nassau County. His wife, Harriet Kalofonos, is joined herein and seeks loss of consortium damages. Claimants contend the defendant is liable absolutely under section 240 of the Labor Law or in negligence under sections 241 and 200 of the Labor Law or under common-law principles.
On March 24,1978, Mr. Kalofonos was working for J & T Painting Co. (J & T), which had a contract with defendant to paint 17 bridges on various State highways on Long Island. At said date the bridge being worked on was an overpass of the Seaford-Oyster Bay Expressway over Waverly Avenue. Mr. Kalofonos was engaged in sandblasting the structural steel beams on the underside of the bridge to clean them preparatory to painting. He did the sandblasting from a scaffold mounted on the rear of a flatbed truck.
The scaffold consisted of a tubular metal frame with two vertical supports on which horizontal wood planks were placed at various levels. Ropes held the frame to the truck and the planks to the frame. The planks were actually ladders covered over longitudinally with boards. Two of them formed the platform from which claimant was working and each plank was 22 to 24 feet long, forming a 5-foot wide platform about 11 feet above the roadway. From the photographs in evidence, it appeared the planks extended approximately five feet beyond the vertical frame supports at both the front and rear of the truck. The metal frame supports appeared to extend about two feet above the planks.
The sandblasting was done with a hose fitted with a nozzle and powered by a compressor. Depending on how much hose was played out, it weighed 20 to 30 pounds. When in use, the nozzle exerted a reactive force against claimant of about 120 pounds. Mr. Kalofonos was wearing a cloth hood with a plastic visor to protect him from the debris that fell back from the sandblasting.
Claimant arrived at the worksite at 8:00 a.m. After waiting for the weather to clear, he started sandblasting at *694 about 10:00 a.m. He was assisted by another J & T employee, who shut the compressor on and off at Mr. Kalofonos’ direction and apparently also moved the truck as the work progressed. The State engineer in charge for the contract had arrived at the jobsite between 8:30 and 10:00 a.m. and J & T’s vice-president and part owner arrived there about 10:30 a.m. Between 11:30 a.m. and noon, while claimant was still sandblasting, and while the State engineer and claimant’s employer were talking to one another near the truck, Mr. Kalofonos fell off the rear of the scaffold onto the roadway. The evidence indicated he was about two feet from the end of the planks when he fell, to wit, beyond the rear metal vertical support.[1] Mr. Kalofonos sustained serious injuries and this claim ensued.
Claimants raise three bases for State liability: (1) absolute liability under subdivision 1 of section 240 of the Labor Law (see, e.g., Kenny v Fuller Co., 87 AD2d 183,186; Yearke v Zarcone, 57 AD2d 457, 459-460); (2) negligence under subdivision 6 of section 241 of the Labor Law, and a rule thereunder (12 NYCRR 23-5.1 [j] [1]) (see Kenny v Fuller Co., supra, p 186, and cases cited); and (3) common-law negligence, as codified in section 200 of the Labor Law (see, e.g., Yearke v Zarcone, supra, p 459; Ramos v State of New York, 34 AD2d 1056).
Considering said section 240 first, it provided, inter alia:
“§ 240. Scaffolding and other devices for use of employees
“1. All contractors and owners and their agents * * * in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, *695 slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.”
Patently, the work being performed by Mr. Kalofonos comes within said subdivision 1 as one or more of “repairing * * * painting [or] cleaning”. {Ibid.) More importantly, we believe the facts show that the scaffold claimant was using was not “so constructed, placed and operated as to give proper protection” to him. Mr. Kalofonos was using a device which exerted substantial backward pressure against him and which itself was bulky and heavy. The sandblasting required him to look and extend his arms upward and seemingly his vision was limited by the hood he wore. Proper protection under these circumstances required at the least that a safety line or railing be constructed on the scaffold to circumscribe claimant’s work area. We note that Mr. Kalofonos testified to safety railings being used on other State jobs. Also, the truck scaffold should not have been so placed or moved as to require claimant to go beyond the vertical metal frame supports, which offered him some, although inadequate support.
Defendant argues that said subdivision 1 is inapplicable because subdivision 2 of section 240 of the Labor Law covers safety railings exclusively. That subdivision provides, inter alia: “2. Scaffolding or staging more than twenty feet from the ground or floor, swung or suspended from an overhead support or erected with stationary supports, except scaffolding wholly within the interior of a building and covering the entire floor space of any room therein, shall have a safety rail of suitable material properly attached, bolted, braced or otherwise secured, rising at least thirty-four inches above the floor or main portions of such scaffolding or staging and extending along the entire length of the outside and the ends thereof, with only such openings as may be necessary for the delivery of materials.” The State contends that since the scaffold here was less than 20 feet above the roadway, there was no statutory requirement of safety railings. However, the State concedes that whether proper protection was given under subdivision 1 is a factual question for the finder of fact. *696 (See Lagzdins v United Welfare Fund-Security Div. Marriott Corp., 77 AD2d 585, 588; Struble v John Arborio, Inc., 74 AD2d 55, 57.)[2] All subdivision 2 does is to make a failure to provide safety railings for scaffolds over 20 feet a failure to provide proper protection as a matter of law. It creates an irrebutable statutory presumption to that effect, but does not create a converse presumption, to wit, that scaffolds less than 20 feet never require safety railings to provide proper protection. (See Weber v State of New York, 53 NYS2d 598, 600.) We believe a proper interpretation of section 240, giving due consideration to the overriding legislative intent and purpose to protect workingmen in dangerous jobs (see Sarnoff v Charles Schad, Inc., 22 NY2d 180,185-186, and case cited; Rocha v State of New York, 77 Misc 2d 290, 296-298, affd 45 AD2d 633, 635; McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 91, 92, 95, 96), and construing and harmonizing the statute in the light thereof (see McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 97, 98, 240, p 414), does not limit use of safety railings to scaffolds over 20 feet under subdivision 2 or presumptively deny such safety devices to scaffolds in all other circumstances, even where proper protection would be given thereby (cf. Tilkins v City of Niagara Falls, 52 AD2d 306, 309-310).
We also observe that devices other than safety railings (such as safety lines, safety harnesses, safety nets or toe-boards) could singly or in combination provide proper protection. Further, the placement of the truck and the method of having claimant work beyond the vertical supports near the rear edge of the planking did not afford him proper protection. (Cf. Cardile v D Ambrosia, 72 AD2d 544.) Our conclusion of State liability under subdivision 1 of section 240 of the Labor Law is based on the factual finding that the mere two flat planks and vertical frame supports did not provide proper protection for a workman under the circumstances of this case.
The State also raises the argument that a rule of the State Industrial Board of Appeals cannot be used as the *697 basis for liability under section 240 of the Labor Law. We disagree in part. That rule, rule 23-5.1, provides, inter alia:
“(j) Safety railings. (1) The open sides of all scaffold platforms, except those platforms listed in the exception below, shall be provided with safety railings constructed and installed in compliance with this Part (rule).
“Exceptions: Any scaffold platform with an elevation of not more than seven feet” (12 ÑYCRR 23-5.1 Q] [1]).
However, said administrative rule is not the basis for the above finding. Rather, we have considered it as some evidence of the standards extant in the construction industry (see Weber v State of New York, 53 NYS2d 598, 599, supra), just as we have considered the other evidence relevant to the issue of proper protection (such as the custom and usage in the industry — see Archie v Todd Shipyards Corp., 65 AD2d 699, 700-701). Such in no way constitutes any deferral of the statutory standard to administrative rule (see Long v Forest-Fehlhaber, 55 NY2d 154, 160). Only the usual and proper consideration of relevant evidence is involved.
In addition to the State’s absolute liability under section 240, we also believe it is subject to negligence liability under said subdivision 6 of section 241 of the Labor Law. That statute provided: “6. All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The board may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work * * * shall comply therewith.”
The State argues that the work here was not construction or demolition within said provision. Facially such an argument appears to have merit, but we believe a liberal interpretation of the statute and rules thereunder should be applied to effectuate the legislative intent of protecting workmen. (See Lagzdins v United Welfare Fund-Security Div. Marriott Corp., 77 AD2d 585, 588, supra; Tilkins v City of Niagara Falls, 52 AD2d 306, 310, supra; McKin *698 ney’s Cons Laws of NY, Book 1, Statutes, §§ 96, 321; see, also, Rocha v State of New York, 45 AD2d 633, 635, supra.) In our view, no violence is done to said statute and its intent if we construe maintenance painting to be within the ambit of the statute.
It would appear that since owner control is no longer necessary for liability under section 241 (see, e.g., Lagzdins v United Welfare Fund-Security Div. Marriott Corp., 77 AD2d 585, 587, supra), notice would similarly be irrelevant (see Miller v Perillo, 71 AD2d 389, 391, and case cited; Monroe v City of New York, 67 AD2d 89, 108), even though said liability is otherwise determined on negligence principles (see Long v Forest-Fehlhaber, 55 NY2d 154, supra). In any event, it also appears that the State had ample notice. Its engineer in charge and his two inspectors were present at the site from the beginning of the sandblasting that morning and the absence of safety railings or other safety devices was obvious. In fact, one or both inspectors were there an hour or two before the work began. The State’s engineer admitted unawareness of the said rule 23 provision (12 NYCRR Part 23), but one inspector said he knew safety railings were required. Claimant had worked for almost two hours in their presence. Clearly, the State through its employees had actual knowledge that Mr. Kalofonos’ employer was not exercising reasonable care to guard against foreseeable dangers and hence “provide reasonable and adequate protection and safety” to claimant. We therefore find nothing improper in subjecting the State to liability in the circumstances here under subdivision 6 of section 241. The proof, including the said administrative rule which is some evidence of negligence (see, e.g., Long v Forest-Fehlhaber, supra, p 160), supports such a finding.[3]
*699 The remaining basis for liability raised by claimants, common-law negligence and its codification in subdivision 1 of section 200 of the Labor Law, was not adequately established. That statute provides:
“§ 200. General duty to protect the health and safety of employees; enforcement
“1. All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places. All machinery, equipment, and devices in such places shall be so placed, operated, guarded, and lighted as to provide reasonable and adequate protection to all such persons. The board may make rules to carry into effect the provisions of this section.”
Liability in negligence under said statute is sustainable only by a showing of (a) negligence by the State itself, or (b) negligence of which the State had notice by a contractor over whose relevant activities the State had control (see Lagzdins v United Welfare Fund-Security Div. Marriott Corp., 77 AD2d 585, 587, supra; Miller v Perillo, 71 AD2d 389, 391, supra; Schnur v Shanray Constr. Corp., 31 AD2d 513). As to State negligence, we find none, mainly because we find no special duty running from it to claimant either on account of its contract with its contractor (claimant’s employer) or its duty to enforce Labor Law provisions. (See Matter of Klee v State of New York, 94 Misc 2d 284.) As to the contractor’s negligence, we have found such and State notice thereof (see pp 696-698, supra), but we do not find that the State’s contract or the presence of its engineer and inspectors imported sufficient control (see Schnur v Shanray Constr. Corp., supra, and case cited; Ramos v State of New York, 34 AD2d 1056, supra; Caldwell v State of New York, 39 Misc 2d 898, 900, affd 22 AD2d 834). This accords with the general rule that an owner is not responsible *700 under section 200 of the Labor Law (and the common law) for the equipment or methods of its contractors. (See, e.g., Zucchelli v City Constr. Co., 4 NY2d 52, cited in Gasper v Ford Motor Co., 13 NY2d 104, 110, mot to amend remittitur granted 13 NY2d 893.) Hence we do not find liability established on this basis.
We note before concluding on liability that defendant apparently objects to claimants’ raising of sections 200 and 241 of the Labor Law because their bill of particulars only referred to section 240 and rule 23 (12 NYCRR Part 23). However, as noted, section 200 is only a codification of common-law negligence, the alternate ground for liability alleged in the claim, and claimants’ reference to section 240 alerted the State that liability against it could be grounded on the conduct of its contractor (see Struble v John Arborio, Inc., 74 AD2d 55, 57, supra). The difference between sections 240 and 241 is that the former is governed by its own standard, independent of negligence (i.e., “proper protection” — see Monroe v City of New York, 67 AD2d 89, 105-106, supra; see, also, Kenny v Fuller Co., 87 AD2d 183, 186, supra; Rea v Elia Bldg. Co., 79 AD2d 1102), and is absolute (see cases cited p 694, supra), whereas the latter is governed by negligence standards and is relative (i.e., comparative negligence is a defense — see Long v Forest-Fehlhaber, 55 NY2d 154, supra; see, also, Kenny v Fuller Co., supra, p 186, and other case cited). However, both can be based on a contractor’s or subcontractor’s conduct irrespective of owner control. (See Haimes v New York Tel. Co., 46 NY2d 132, 136.) The difference between sections 241 and 200 is that liability under the former for a contractor’s negligence does not require owner control or, apparently, notice (see p 698, supra), while liability under the latter requires both (see p 699, supra). The claim and bill specifically alerted defendant to section 240 and common-law negligence and hence to the elements inherent in sections 200 and 241. Also, the bill’s reference to rule 23 (12 NYCRR Part 23) should have additionally alerted defendant to those latter two provisions since both refer to the rules. (See Long v Forest-Fehlhaber, supra, p 160, n 6). Therefore, we find no prejudice to a substantial right of defendant by the consideration of said provisions *701 herein. (See Frattura v Cozzolino Constr. Corp., 63 AD2d 1098,1099; Smith v Victory Container Corp., 26 AD2d 988; CPLR 2001, 3025, subd [c]; see, also, Loomis v Civetta Corinno Constr. Corp., 54 NY2d 18, 23-24.)[4]
To conclude on liability, we therefore find the State liable under subdivision 1 of section 240 of the Labor Law and subdivision 6 of section 241, but not under subdivision 1 of section 200, or under common-law negligence.[5]
The remaining issue is damages. At the time of the accident Mr. Kalofonos was 32 years of age. His wife was then 25 years old and pregnant with their first child. They now have two daughters, aged three and two at the time of trial. Claimant came to this country in 1969 from Greece, where he had worked as a crane operator. From then until the accident he worked as a bridge painter and became a member of the Bridge Painters Union in 1977. The business representative of his union local testified that claimant’s union contract wage was $11.68 per hour at the time of the accident and that wage increases averaged 10% a year. This witness also indicated that earnings for union members averaged over $15,000 then (plus fringe benefits worth 28% of said wage), although other evidence indicated Mr. Kalofonos’ earnings were somewhat below that,[6] and that members’ wages averaged $20,000 to $25,000 (plus fringe benefits) at the time of trial.
In his fall from the scaffold, Mr. Kalofonos suffered a fractured skull. As he lay on the roadway, he was bleeding from his right ear, but was apparently semiconscious since he was mumbling and raving. He was taken by ambulance to Nassau County Medical Center in East Meadow. On admission claimant was observed to be disoriented, raving, agitated and uncooperative. He remained hospitalized for *702 seven days. A receptive aphasia developed during his hospital stay and was noted as improved upon his discharge on March 31, 1978. The fracture was on the right side of the skull and hemorrhaging of the brain was noted in that area. A contusion on the left side of the brain was also diagnosed. During his hospitalization, Mr. Kalofonos had severe headaches for which he was given medication and his other symptoms consisted of dizziness, vertigo, blurred and double vision, scalp tenderness, impaired balance, episodic nausea, buzzing and hearing loss in his right ear and forgetfulness (see n 1, p 694, supra). His hospital charges for the seven days totaled over $3,300.
Mr. Kalofonos returned to the hospital more than 25 times in the next four years for tests or treatment for various complaints arising from his brain injury. He also saw and continues to see two doctors, one of whom is a neurologist and psychiatrist. Medication was prescribed for his pain, tension and vertigo and apparently he is still taking drugs therefor.
Said treating neurologist and psychiatrist, testified as claimants’ medical expert at trial. He stated that Mr. Kalofonos sustained permanent brain damage in his fall, with the brain in the area of the contusion wasting away because damaged brain cells do not regenerate or repair themselves. In this physician’s opinion, claimant’s headaches, loss of memory, buzzing and hearing loss in his right ear (the doctor indicated the acoustic nerve was damaged), impaired balance and blurred vision are permanent and were caused by the subject accident. He also stated that the brain damage caused emotional and mental problems and that claimant has an acute mental disturbance. The hospital records indicate Mr. Kalofonos had chest pains three and four years after the fall which were attributed to stress and anxiety arising from his injuries. Claimants’ medical expert further indicated Mr. Kalofonos cannot endure loud noises without getting severe headaches and that his relationships with people will not substantially improve. Mrs. Kalofonos testified that her husband is now short-tempered, hits her and their daughters without reason and does not want to be with other people. Mr. Kalofonos stated he cannot read because he gets dizzy and does no physical *703 work around the house because he seemingly cannot concentrate on any job long enough to finish it without getting headaches. Claimants’ physician concluded Mr. Kalofonos was permanently disabled from employment and is not a candidate for rehabilitative vocational therapy.[7] His life expectancy is now about 37 years and his working life expectancy is about 26 years.
On the basis of the foregoing and the entire trial record, we find claimant’s fall caused permanent brain damage and the noted permanent physical and psychological symptoms alluded to above. We also find him permanently disabled with respect to any significant income-producing employment.
Accordingly, by reason of his injuries, both physical and psychological, his medical expenses and his past, present and future pain and suffering and loss of earnings, it is the court’s determination that Spyros Kalofonos has been damaged in the total amount of $525,000. We also determine that his wife, Harriet Kalofonos, has been damaged in the amount of $25,000 for her past, present and future loss of consortium. (See, e.g., Millington v Southeastern Elevator Co., 22 NY2d 498, 502-503.)
All motions made by the defendant at the conclusion of claimants’ case and at the close of evidence, upon which decision was reserved, are now denied.

. We note one of the State’s inspectors testified to claimant being “blown” off the truck upon restarting the nozzle after the truck had been moved. This version of how claimant fell was not supported by the State’s engineer, who also supposedly saw the fall, or by J & T’s vice-president, or by contemporaneous documentary evidence. Mr. Kalofonos had no memory how he fell and while there was not appropriate proof adduced to show this was due to an amnesia sufficient to entitle claimants to a lesser standard of proof (see, generally, PJI 1:62), we have not given undue weight to his failure to describe the specifics of the fall or controvert the various State versions. In any event, to the extent the manner of claimant’s fall involved his own culpable conduct, such is irrelevant to the claimed absolute liability under section 240 of the Labor Law. (See, e.g., Kenny v Fuller Co., 87 AD2d 183, 186, and cases cited.)

. Of course, in the proper evidentiary circumstances a directed verdict or even summary judgment may be proper. (See, e.g., Haimes v New York Tel. Co., 46 NY2d 132; Rea v Elia Bldg. Co., 79 AD2d 1102.)

. We note comparative negligence is a potential pro rata defense in an action grounded on subdivision 6 (see Long v Forest-Fehlhaber, 55 NY2d 154), but defendant neither pleaded nor proved such (see CPLR 1411,1412). The State moved at the close of trial to amend its answer to add that defense, but claimants claimed surprise and we found them prejudiced by such belated raising of this issue, particularly since claimants clearly had prosecuted their claim primarily on the basis of absolute statutory liability, where contributory or comparative negligence is irrelevant (see Kenny v Fuller Co, 87 *699 AD2d 183,186, and cases cited; Evans v Nab Constr. Corp., 80 AD2d 841, and case cited; Long v Murnane Assoc., 68 AD2d 166). As indicated, claimants clearly raised the alternate ground of negligence in their claim and thus defendant was made aware of the possible applicability of any culpable conduct by Mr. Kalofonos. (See CPLR 1411.) In any event, we did not find the evidence sufficient or persuasive enough to establish such. (See CPLR 1412.)

. We also find without merit defendant’s contention that Federal Occupational Safety and Health Act standards are controlling here. (See Berardi v Getty Refining & Marketing Co., 107 Misc 2d 451, 452-461.)

. Implicit in our finding of liability is our finding that the State’s violation of subdivision 1 of section 240 and its negligence under subdivision 6 of section 241 were proximate causes of claimant’s fall.

. Mr. Kalofonos testified that he reported about $9,000 in income on his 1977 tax return, but it should be mentioned that he returned to Greece and married his wife that year. He thus worked only part of the year and therefore the $9,000 represented only a part of what he would otherwise have earned in 1977 had it been an average year.

. In weighing the opinions of the opposing medical experts in respect to vocational therapy and future employment, we have found claimant’s treating physician more persuasive.