Bruce **ADAMS**, Individually and d/b/a Southwest Safaris, Plaintiff-Appellant,

v.

**LINDBLAD TRAVEL, INC.**, Special Expeditions, Inc., Defendants-Appellees,

and

Sven-Olof Lindblad, Defendant.

No. 448, Docket 83–7606.

United States Court of Appeals, Second Circuit.

Argued Dec. 16, 1983.

Decided March 8, 1984.

Roger C. Adams, New York City, for plaintiff-appellant.

Robert S. Cohen, New York City (Leonard W. Diamond, Lans, Feinberg & Cohen, New York City, of counsel), for defendants-appellees.

Before MESKILL, CARDAMONE and PIERCE, Circuit Judges.

CARDAMONE, Circuit Judge:

In this breach of contract case plaintiff obtained a jury verdict for $7,650 in damages against defendants in the United States District Court for the Southern District of New York (Metzner, J.). Plaintiff has appealed claiming principally that the trial court's charge on the issue of damages incorrectly limited the amount he was entitled to recover.

## I. BACKGROUND

Bruce Adams, d/b/a Southwest Safaris, is in the business of designing and conducting adventure tours. A comfortable chartered bus is not part of this tour package. For those who subscribe to Adams' tours of the Four Corners region—where the states of Colorado, New Mexico, Arizona and Utah meet—travel is by more imaginative means. Taking groups of five or less, Adams utilizes a helicopter, horse, jeep and river raft to show his clients America's Southwest. Defendant Lindblad Travel, Inc. is a prominent wholesaler of adventure tours, and its subsidiary, defendant Special Expeditions, Inc., promotes such tours within the United States. Since its beginnings in 1979, Special Expeditions has been managed by its president, defendant Sven Olof Lindblad.

Defendants sought out Adams in 1978 with a proposal for a joint business venture. According to the terms and conditions of an agreement reached in the fall of 1979, the parties were to develop a number of air tour programs for the Four Corners region to be conducted in 1980 and 1981. These programs, known as Special Expeditions' American Wing Safari, featured Adams as tour operator. Defendants, meanwhile, were to promote, market and sell the tours and pay Adams a set price per planeload of passengers (which in 1980 was $5,700 for "lodge" trips and $4,030 for "camping" trips). The specific itineraries, dates and prices of all tours would be mutually agreed upon by the parties in advance of sale, and it was agreed that the identity of Bruce Adams as founder of Southwest Safaris would be mentioned in all advertising and marketing materials.

During 1980 the American Wing Safari program ran smoothly. Defendants did in fact market and sell several five-passenger safaris, four of which actually departed. At the outset of negotiations for 1981, defendants expressed their dissatisfaction with the four-to-five passenger format. They insisted that each tour be increased to 20 passengers to make the venture more profitable. By letter to Adams of December 29, 1980 defendants proposed an itinerary for September 16, 1981, which required Adams to accommodate 20 passengers in groups of five passengers each. Adams rejected it. He asserted that safety considerations related to hazardous flying conditions at the South Rim Airport on the edge of the Grand Canyon resulting from its high altitude (thin air) and dangerous turbulence precluded an itinerary that required tightly scheduled landings with a fully loaded aircraft, i.e., the itinerary proposed by defendants. It soon became clear that the parties were nearing an impasse.

During the last week of January 1981 defendants sold their version of the September 16 itinerary to Eli International, Inc., a branch of the Yale University Alumni Association. The sale took place without Adams' prior knowledge or consent and violated the parties' earlier agreement that Adams and Lindblad mutually agree on itineraries, dates and prices in advance of sale. By letter dated January 30, 1981 defendants informed Adams that they had sold the September 16 itinerary, exactly as presented in their December 29 letter. On February 6 Adams telephoned Special Expeditions demanding an explanation. Since

Sven Lindblad was out of the country, his executive secretary, Pamela Fingleton, spoke to Adams. She acknowledged the need for a quick resolution of the parties' differences and assured Adams that Lindblad would return his call.

Because of their need to assure an itinerary for Eli International, defendants had already begun to search for another tour operator. On February 4, 1981 Ms. Fingleton wrote to Patrick Conley, President of Wild & Scenic Inc., and requested details as to that company's ability to conduct tours of the Four Corners. Negotiations with Wild & Scenic continued through March 4 when Lindblad offered Conley the American Wing Safari tour, identical to the proposed September 16 itinerary he was still discussing with Adams. Meanwhile, defendants continued to take advantage of Adams' expertise and reputation. Specifically, they mailed out more than 11,000 newsletters on March 2, 1981 promoting the American Wing Safari, emphasizing that Adams, with extensive knowledge of the Southwest and a 10-year perfect flying safety record, would be conducting the aerial tours. In addition, and contrary to the original agreement, the newsletters failed to mention that Adams founded Southwest Safaris.

Because of defendants' sale of the September 16 itinerary without his knowledge and their insistence that he fly that itinerary with 20 passengers, Adams terminated the business relationship on March 5, 1981. As a result, he found himself in difficulties with respect to the 1981 season. Having relied entirely on defendants' agreement to promote his business, Adams was faced with the prospect of putting together a marketing campaign at the last minute. Consequently, from 1980 to 1981 the number of passengers he carried dropped drastically—from 134 to 57. Meanwhile, defendants continued blithely to appropriate the information and itineraries obtained by them from Adams and through Wild & Scenic conducted their own aerial tours of the Southwest. The proof at trial showed that during the summer of 1981 defendants carried 34 passengers they otherwise would have referred to Adams.

From this background the present litigation ensued in district court. Adams made a number of claims, including, breach of contract, misappropriation of business information, unjust enrichment and breach of fiduciary duty. The district court judge dismissed the fiduciary breach claim at trial as well as all claims against Sven Lindblad individually. It also ruled that the evidence produced was insufficient to support Adams' claim in *quantum meruit*. The trial court submitted the breach of contract and misappropriation of business information causes of action to the jury. In response to special interrogatories, the jury found that defendants breached their contract with Adams, but did not misappropriate business information. Accordingly, it awarded Adams $7,650 as damages for breach of contract. This amount was the top limit imposed by the court's charge. On appeal Adams argues that the district court erred by: limiting contract damages to $7,650; refusing to allow an award of pre-judgment interest; refusing to charge the jury on his claim in *quantum meruit;* and holding as a matter of law that he could not collect damages on an agency theory. We find merit only as to the first two contentions and remand this case to the district court for reconsideration solely on the issue of damages. In all other respects the judgment is affirmed.

## II. *CONTRACT DAMAGES*

Since defendants do not dispute the jury finding that defendants had breached the contract they had with Adams, liability is not an issue on appeal. With respect to damages, Adams claims that the district court's charge placing a ceiling of $7,650 on his contractual recovery was erroneous. The way in which the district court arrived at this figure was to make the following calculations:

| | | |
|---|---|---|
| (1) | $57,000 | Adams' actual 1981 gross revenues (57 passengers carried by Adams at $1,000 each) |
| (2) | + 32,060 | Adams' lost revenues (8 planeloads at $4,060 each—mathematical error should be $32,480) |
| (3) | 89,060 | Adams' projected gross revenues but for the breach |
| (4) | − 24,000 | Average fixed costs |
| (5) | 65,060 | |
| (6) | − 44,530 | Variable costs (one-half of gross revenues) |
| (7) | $20,530 | divided by 91* passengers = $225 net profit/ per passenger |

$$\begin{array}{r} \text{x34 passengers} \\ \hline \$7650 \text{ Lost Profits} \end{array}$$

* (91 passengers are the 57 Adams actually carried in 1981 plus the 34 referred to Wild & Scenic by defendants.)

---

In essence, the district court was attempting to determine how much Adams would have profited from handling the eight additional planeloads (or 34 customers) referred by defendants to Wild & Scenic in 1981.

Adams challenges the court's figures on several grounds. First, he argues that the district court should have instructed the jury to award Adams the difference between his profits in 1979—the year prior to his agreement with defendants—and his losses in 1981. Second, he claims that the formula used by the court was flawed because it mistakenly took into account Adams' fixed costs. Finally, he asserts that the numbers the trial court plugged into this formula are erroneous.

■ The general rule for measuring damages for breach of contract has long been settled. It is the amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract. *Perma Research & Development v. Singer Co.*, 542 F.2d 111, 116 (2d Cir.), *cert. denied*, 429 U.S. 987, 97 S.Ct. 507, 50 L.Ed.2d 598 (1976); *Chamberlain v. Parker*, 45 N.Y. 569, 571 (1871); 11 S. Williston *A Treatise on the Law of Contracts*, § 1338, at 198 (3d ed. 1968); 5 A. Corbin, *Corbin on Contracts* § 992 (1964). Therefore, Adams improperly seeks damages based on his 1979 profits. Even were defendants to have fulfilled their 1981 contractual obligations, there is no reason to believe that such would have guaranteed Adams the same success he enjoyed two years earlier. Too many variables, apart from the breach, could have caused a discrepancy between Adams' 1979 and 1981 profits. That is to say, the 1979 economy might have been more conducive to domestic travel, or Adams' potential market might be finite and his pool of possible customers might diminish each year.

Even more important for our purposes is the fact that Adams' lost revenues for 1981 can readily be measured in terms of the business taken from him by defendants. With profit as the incentive, defendants promoted the tours conducted by Wild & Scenic just as vigorously as they would have promoted tours conducted by Adams. Further, defendants used Adams' name in their March 1981 newsletter, as they would have done had Adams agreed to conduct the tours. Thus, Adams cannot successfully argue that he lost any more business in 1981 than that represented by the eight planeloads (or 34 passengers) handled by defendants.

■ Having established the basis for computing Adams' lost revenues, it is relatively easy to find the proper formula for his lost profits. But for the breach, Adams' lost 1981 profits equal the revenues he would have received from the 34 additional passengers (*i.e.*, additional revenues) minus the additional costs he would have

incurred in handling those passengers (*i.e.,* additional costs). The district court's error was in considering Adams' "fixed costs." Simply stated, fixed costs represent the total dollar expense that occurs regardless of output and include such "overhead" items as an enterprise's commitments for rental and maintenance, depreciation and the like. *See, e.g.,* P. Samuelson, *Economics* 443 (8th ed. 1970). Adams has already paid his fixed costs for 1981 and by definition would have paid the same amount of fixed costs regardless of whether he carried 57 passengers, 91 passengers or even zero passengers. Thus, he would not have incurred any additional fixed costs handling 34 extra passengers. What he would have incurred are "variable costs," such as expenses for additional fuel and supplies. *See id.*

We restate the correct damage formula as follows:

(1)  Additional Revenues from carrying 34 extra passengers

(2) − Additional Costs incurred in carrying 34 extra passengers (*i.e.,* additional variable costs)

(3)  Additional Profits Adams would have made but for the breach.

The remaining task is to determine what numbers should be plugged into this formula. "Additional revenues" equal the number of additional passengers (34) times the tariff Adams would have received from each passenger. If the evidence shows that Adams would have collected per planeload, as urged by plaintiff, rather than per passenger, as stated in defendants' brief, then additional revenues equal the number of additional planeloads he would have flown times the tariff he would have received from each planeload. These are questions of fact, and on remand the parties should be permitted to present to the jury any evidence that might bear on them. Similarly, the parties should present evidence as to the additional costs Adams would have incurred in handling the extra passengers. Additional costs equal either the number of extra passengers times the variable costs per passenger or, under a planeload approach, the number of extra planeloads Adams would have handled times the variable costs per planeload. If, for example, Adams proves that the breach cost him 34 passengers, that each passenger would have paid him $1000 and that each would have cost him an additional $500, the jury must award him $17,000:

(1)  $34,000 revenues (34 passengers @ $1000)

(2) − 17,000 costs (34 passengers @ $500)

  17,000 profits

### III.  *PREJUDGMENT INTEREST*

Adams further contends that the district court erred in refusing to grant him prejudgment interest. Since federal jurisdiction in this case is premised on diversity and the right to interest on a cause of action qualifies as a substantive right, we must look to New York law. *See, e.g., Spector v. Mermelstein,* 485 F.2d 474, 481 (2d Cir.1973). The applicable state statute provides, in pertinent part: "Interest *shall* be recovered upon a sum awarded because of a breach of performance of a contract ...." N.Y.C.P.L.R. § 5001(a) (McKinney 1963) (emphasis supplied). Under the law of New York, therefore, prejudgment interest is normally recoverable as a matter of right in an action at law for breach of contract. *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 425 F.2d 947, 950 (2d Cir.1969).

■ Despite the fact that Adams neglected at trial to ask the district court for an award of prejudgment interest, he is not precluded from doing so on remand. In *Lee v. Joseph E. Seagram & Sons, Inc.,* 592 F.2d 39, 42–44 (2d Cir.1979), we held that in some circumstances the failure to request prejudgment interest either in the complaint or at trial constitutes a waiver of the statutory entitlement. This is not such a case. More instructive is *Newburger, Loeb & Co., Inc. v. Gross,* 611 F.2d 423 (2d Cir.1979). Here, as in *Newburger,* the policies of "finality and repose" underlying the *Lee* decision are not present. *Id.* at 432–33. Since we are remanding this case for a redetermination of damages, the parties have no legitimate expectation that the issues relating to the ultimate award have been finally decided. Moreover, the dis-

trict court on remand will have ample opportunity to determine such a necessary issue as when the cause of action accrued. Thus, Adams can and should receive prejudgment interest pursuant to N.Y.C.P. L.R. § 5001.

#### IV. *QUANTUM MERUIT AND AGENCY CLAIMS*

Although he has succeeded in obtaining damages for breach of contract, Adams insists that he is also entitled to recover on theories of *quantum meruit* and breach of fiduciary duty. His *quantum meruit* claim alleges that defendants were unjustly enriched because they took and used for their own benefit his advice, information and itineraries. Adams' agency claim asserts that defendants were his agents and, as such, breached a duty of good faith and loyalty by engaging in a competitive business. For these infringements, Adams seeks damages for the value of his services, recovery of any profits defendants might have realized from conducting competitive air tours and all damages naturally resulting from defendants' unauthorized acts.

We need not deal with these claims in any detail for they are wholly without merit. As the record clearly shows, Adams' purported causes of action in *quantum meruit* and agency merely duplicate his contract claim. The ultimate goal underlying each of these theories of recovery is to make the injured party whole. In this case, Adams is made whole once he is placed in the same economic position he would have occupied but for defendants' breach. As already discussed, contract damages for his lost profits will restore Adams to that position. To accept Adams' arguments and grant full recovery under three alternative theories would in effect award the same damages three times. There is no legal or equitable basis to afford plaintiff such a windfall.

Accordingly, the judgment is reversed and remanded for a redetermination of damages. Additionally, the district court should award plaintiff prejudgment interest pursuant to N.Y.C.P.L.R. § 5001. The judgment of the district court in all other respects is affirmed.