**RECORD CLUB OF AMERICA, INC., Plaintiff,**

v.

**UNITED ARTISTS RECORDS, INC., Defendant.**

No. 72 Civ. 5234 (WCC).

United States District Court, S.D. New York.

Oct. 5, 1988.

See also, S.D.N.Y. 80 B.R. 271.

McGuire & Tiernan, New York City (Harold F. McGuire, of counsel), Nancy G. Grossman, New York City, for plaintiff.

Phillips, Nizer, Benjamin Krim & Ballon, New York City (Janet P. Kane, Robert S. Powers, David Given, of counsel), for defendant.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiff, Record Club of America, brought this action for breach of contract against United Artists Records, Inc. (UAR), in 1972. In 1974, Record Club filed a petition in the Bankruptcy Court for the Middle District of Pennsylvania under Chapter 11 of the Bankruptcy Act. At the request of the court-appointed receiver, this action was transferred to the Court's suspense docket. Sigmund Friedman, the president of Record Club and its sole shareholder, urged the receiver to pursue this litigation. Nevertheless, the receiver abandoned the claim. When Record Club emerged from bankruptcy in 1982, Friedman requested that the action be restored to the Court's active calendar.

In December 1985, the Court held a non-jury trial on the liability issues in the case. In an opinion and order dated September 8, 1986, the Court held that UAR unjustifiably repudiated its agreement with Record Club, and that the repudiation was not retracted or waived. *Record Club of Am., Inc. v. United Artists Records, Inc.*, 643 F.Supp. 925 (S.D.N.Y.1986). The Court also held that UAR actually breached the agreement on a number of different occasions.

The Court conducted a four-day, non-jury trial with respect to damages which commenced on May 2 and concluded on May 5, 1988. Plaintiff sought to prove damages in the amount of $5,953,282.81. At the conclusion of the trial, the parties agreed to submit post-trial memoranda, and they filed their final submissions on September 14, 1988. The Court has carefully reviewed these memoranda, as well as the testimony and documentary evidence received at trial. This opinion and order incorporates the Court's findings of fact and conclusions of law as required by Rule 52(a), Fed.R.Civ.P.

For the reasons set forth below, plaintiff is entitled to damages in the amount of $2,322,830.90,[1] less any set-off that defendant is able to prove. The Court reserves judgment on the validity of defendant's claimed set-offs for $179,756.66 and for $809,123.42, which are currently pending in the bankruptcy proceeding, until the bankruptcy court has acted upon those claims. Accordingly, judgment will be granted forthwith, pursuant to Rule 54(b), Fed.R. Civ.P., in the amount of $1,333,950.90, plus pre-judgment interest, which represents Record Club's proven damages, less the claimed set-offs. A supplemental judgment may be entered depending upon the disposition of the claimed set-offs.

## I. BACKGROUND

Record Club was a mail-order business founded in 1957 and incorporated in 1961. Membership in Record Club was predicated on the payment of a one-time membership fee, which entitled a new member to a number of musical recordings, known as new member frees, as well as the right to purchase additional recordings at substantial discounts. 643 F.Supp. at 928.

Approximately monthly until 1973, and periodically thereafter until the receiver in bankruptcy suspended business operations in 1977 (Tr. 325), Record club distributed to its members a catalogue called the "Disk and Tape Guide" containing up-to-date listings of record albums, cassette tapes, and eight-track cartridges that were available for purchase. In its catalogues and advertising, Record Club promised existing and prospective members that it would process and ship their orders on the same day those orders were received. Consequently, it was critical to Record Club that it receive advertised recordings promptly from its suppliers. *Id.*

On October 1, 1971, Record Club and UAR entered into a licensing agreement in settlement of an antitrust action which Record Club had initiated. 643 F.Supp. at 928. The agreement licensed Record Club with respect to UAR's catalogue of musical recordings. UAR's catalogue was a broad catalogue of approximately 1,000 different recordings, and it included certain types of music as to which Record Club had no access under any of its other licenses (Tr. 79–80).[2]

The agreement permitted Record Club to sell UAR's licensed recordings to Record Club's existing members and to distribute licensed recordings free to prospective members. It also allowed Record Club to distribute licensed recordings to existing members as bonuses (Exh. A).[3] These bonus recordings were commonly referred to as order processing frees or promotional frees.

The agreement provided for an initial term of three years with two option periods of two years each, followed by a six-month period during which Record club could sell its remaining inventory (Exh. A). To exercise the first option Record Club had to notify UAR in writing ninety days prior to expiration of the initial term. In addition, Record Club was required to pay guaranteed or minimum royalties of $120,000 during the first option period. In an opinion and order dated July 30, 1974, the Court relieved Record Club from its untimely exercise of the first option. *Record Club of*

---

**1.** Figures in the millions were rounded to the nearest tenth.

**2.** The symbol "Tr." followed by a page number is a reference to the trial transcript.

**3.** The symbol "Exh." followed by a number or a letter represents a reference to a trial exhibit at the damages trial.

*Am., Inc. v. United Artists Records, Inc.,* No. 72 Civ. 5234 (WCC), slip op. at 17–19. In a later opinion, the Court ruled that Record Club's damages should be reduced by the $120,000 guaranteed, minimum royalty owed but not paid for the first option period. *Record Club of Am., Inc. v. United Artists Records, Inc.,* 80 B.R. 271, 278 (S.D.N.Y.1987). As to the second option period, the Court ruled that damages for lost profits during that period would be too speculative, and therefore precluded the parties from offering evidence with respect to damages for that period (Tr. 166–67).

As the Court found in the liability decision, UAR's performance of its contractual obligations was less than satisfactory from the outset. At the height of the 1970 Christmas season, Record Club experienced significant delays in obtaining UAR recordings. 643 F.Supp. at 930. During the first two quarters of Record Club's 1972 fiscal year, July 1, 1971 to December 31, 1971, Record Club experienced additional severe delays in obtaining licensed recordings from UAR (Tr. 26–37, 214). 643 F.Supp. at 931. Consequently, during the latter part of the first fiscal quarter of 1972, Record Club reduced the number of UAR recordings advertised in the Disc and Tape Guides (Tr. 33–34; Exh. 1).

Partly as a result of the reduced listings, and partly as a result of the poor service UAR provided with respect to the recordings listed, Record Club experienced a low level of sales of UAR recordings relative to the sales of other recordings during the second fiscal quarter of 1972. *Compare* Exhs. 31 & 32; *see also* Tr. 35. This decline was contrary to Record Club's normal seasonal business pattern. Generally, the second and third fiscal quarters were Record Club's strongest quarters for sales, while the first and fourth quarters were weaker (Tr. 33, 36).

Record Club experienced a similar decline in sales in the first quarter of fiscal year 1972. While this was partly due to the poor service and the consequent reduction in listings, it also reflected the normal seasonal pattern (Tr. 33–34).

During the third and fourth quarters of fiscal 1972, Record Club increased its listings of UAR recordings (Exh. 1). Record Club experienced a corresponding increase in sales of UAR recordings in the third fiscal quarter relative to the second quarter, and sales increased again in the fourth quarter over the third (Exh. 33). In subsequent fiscal years, however, Record Club's sales of UAR recordings were negligible (Exh. 33). As the Court held in the liability decision, UAR's breach and repudiation of the license agreement totally destroyed the value of the agreement. Now, the Court must determine the value of that agreement.

## II. DISCUSSION

Record Club claims the following damages: (1) lost profits on the distribution of UAR recordings for both Record Club of America and Record Club of Canada; (2) lost profits on the anticipated purchases of members who would have joined Record Club but for UAR's breach; (3) lost profits on membership acquisition attributable to UAR; (4) the loss of UAR's share of Record Club's list rental and insert income; (5) miscellaneous items; and (6) loss of its value as a going concern.

Record Club's claim for lost profits on the distribution of UAR recordings is based on Record Club's actual sales in the period immediately preceding the breach. Record Club calculated the net profit it earned on UAR recordings in the second half of its 1972 fiscal year ("the base period"), and projected those profits forward from the beginning of fiscal year 1973 through the end of the first option period to the agreement in September 30, 1975, followed by a two-month sell-off period. The calculations for the base period are summarized in exhibit 5.

At trial, defendant objected to the introduction of exhibit 5. The Court admitted the exhibit subject to a motion to strike. Defendant now moves to strike this exhibit from the record.

In December 1987, plaintiff modified the calculations on which exhibit 5 is based. As a result, plaintiff's calculation of the

gross sales of UAR recordings increased from $744,632.18 to $765,885.64. Defendant objected on the ground that a modification of the calculations so close to trial, which was then scheduled for January 4, 1988, was prejudicial. At a pretrial conference held on December 14, 1987, the Court permitted the modifications to the extent that they represented mathematical changes, but precluded the modifications to the extent that they represented a new theory of damages.

Defendant argues, and plaintiff now concedes, that the modifications were the result of a change in methodology. The initial calculations were based on the average sale price of UAR recordings in each of the two quarters making up the base period. The modified calculations, however, do not use a separate average price for each quarter. Instead, plaintiff averaged the price of UAR recordings over the entire base period. This change in methodology apparently accounts for the discrepancy in gross revenues between the two periods. Nevertheless, the theory of damages remained precisely the same—that is, that plaintiff's lost profits equal the profits it earned under the contract in the pre-breach base period, annualized and projected throughout the life of the contract. Thus, defendants were not prejudiced, and the motion to strike is denied. Defendant also moved to strike exhibits 6 and 67 on the same grounds. Consequently, the motion to strike those exhibits is denied as well.

Record Club, as the plaintiff, bears the burden of proving a reasonably certain method for estimating what it would have earned had UAR not breached. *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir.1977). Nevertheless, "the party who has caused the loss may not insist on theoretical perfection." *Entis v. Atlantic Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir.1964).

■ UAR challenges the accuracy of Record Club's projection of profits on a number of grounds. First, citing *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir.1984), UAR claims that a projection of past profits is invalid as a matter of law.

This interpretation of *Adams*, however, is too broad. In *Adams*, the court rejected the projection of past profits into the future because damages could more accurately be measured in terms of the business that defendants took from the plaintiff. This measure of damages is unavailable in this case because Record Club and UAR were not competitors. Moreover, UAR has failed to suggest a more accurate method of measuring damages. Indeed, when UAR presented an alternative measure of damages through the testimony of its expert witness, the witness also relied on a projection of past profits as the measure of damages (Tr. 535). Although it may be improper to rely on past sales as an indicator of future sales when a more accurate measure is available, there is no support for the contention that projections of past profits is improper as a matter of law.

■ UAR also objects to the projection of past profits on the ground that the public's taste for musical recordings is unpredictable. New York law has long recognized the inherent uncertainties of predicting profits in the entertainment field. *See, e.g., Freund v. Washington Square Press, Inc.*, 34 N.Y.2d 379, 357 N.Y.S.2d 857, 314 N.E.2d 419 (1974) (books); *Broadway Photoplay Co. v. World Film Corp.*, 225 N.Y. 104, 121 N.E. 756 (1919) (movies) (Cardozo, J.); *Bernstein v. Meech*, 130 N.Y. 354, 29 N.E. 255 (1891) (theater). Unlike the typical entertainment case, however, this case involves a catalogue of 1,000 recordings, which therefore can be expected to weather shifting consumer tastes.

The evidence submitted at trial demonstrates that the UAR catalogue maintained its vitality throughout the damage period despite the shifting popularity of individual albums in the catalogue. UAR points out that during the base period Don McLean's "American Pie," a UAR recording, was the number-one album on the *Billboard* charts. Nevertheless, the evidence indicates that this did not distort sales during the base period. Prior to December 25, 1971, the date on which the base period commenced, Record Club's sales of UAR recordings appearing on the *Billboard* charts constituted

19.74% of Record Club's total sales of UAR albums (Exh. 84). During the base period, even though the Don McLean album accounted for 14.59% of Record Club's sales of UAR recordings (Exh. 84), Record Club's sales of all UAR albums appearing on the charts constituted only 21.25% of its total sales of UAR recordings—an increase of only 1.51%.

UAR regularly had hits. In fact, at times during Record Club's damage period, UAR had even more hits than it did during the base period. For example, in the third and fourth quarters of fiscal 1973, UAR had an equal or greater number of recordings on the charts than it did in the base period or in any other pre-repudiation quarter (Exhs. 84, CU; Tr. 598–602).

Moreover, the position of a recording on the charts was not a perfect indicator of its performance with Record Club. Notably, Don McLean's album did not sell as well for Record Club as a Fifth Dimension album which reached only # 83 on the charts (Tr. 601), and Soul City 92005, which was Record Club's most successful UAR recording with the exception of the Don McLean album, was not even on the charts (Exhs. T through Y, CU; Tr. 211, 417). Thus, while shifting consumer taste undoubtedly had an effect on the sales of individual musical recordings, it had no significant impact on the UAR catalogue viewed as a whole.

UAR also asserts that the base period is an unreliable indicator of lost profits because it is too short for a business which Record Club concedes is seasonal. As discussed above, the second and third quarters of Record Club's fiscal years were its strongest quarters. The base period included the third and fourth quarters of the fiscal year, but excluded the second and first quarters. Consequently, seasonal factors should not have caused the base period to be any stronger than the other half of the year.

Nonetheless, sales of UAR recordings increased significantly in the base period. Record Club attributes this to UAR's poor service during the first half of the year. According to the testimony of Record Club's president, this service improved during the base period, and Record Club claims this accounts for the increase in sales of UAR recordings. UAR, however, notes that Record Club's sale of non-UAR recordings increased by 11% during the base period, and therefore claims that the increase in Record Club's sales of UAR recordings was the result of the seasonal nature of the business rather than improved service.

Record Club responds that this merely underscores the significant distortion in UAR sales in the first half of fiscal 1972. While sales exclusive of UAR increased by only 11%, sales of UAR recordings increased by 116%. This distortion in sales of UAR recordings certainly was atypical. Although a full-year cycle would be preferable under ordinary circumstances, under these circumstances a full-year cycle would reward the defendant for its failure to fulfill its contractual obligations.

Nevertheless, the sales figures for non-UAR recordings show that 11% of the increase was due to causes independent of UAR. By utilizing a semi-annual base period in which sales were 11% higher than in the other half of the year, Record Club inflated its annual sales by 5.5%. To compensate for this distortion Record Club's projected profits on UAR sales will be reduced by 5.5%.

■ UAR also asserts that Record Club's projections are flawed because they fail to account for substituted sales of non-UAR recordings in place of UAR recordings. UAR contends that as a result of obtaining additional recording licenses subsequent to the breach, Record Club's sales of recordings under other licenses offset the lost UAR sales. It is well settled, however, that when the contract between the parties does not prevent the non-breaching party from entering into similar contracts with others, profits made under such similar contracts after the breach in no way reduce the damages to which the non-breaching party is entitled. *See G & R Corp. v. American Sec. & Trust Co.*, 523 F.2d 1164, 1174 (D.C.Cir.1975); *Emmco Ins. Co. v. Wallenius Caribbean Line*,

*S.A.*, 492 F.2d 508, 514 (5th Cir.1974); *Willred Co. v. Westmoreland Metal Mfg. Co.*, 200 F.Supp. 59, 63 (E.D.Pa.1961); J. Calamari and J. Perillo, *The Law of Contracts* § 14–16 (3d ed. 1987); 5 Corbin, *Contracts* § 1041 (1964).

In the instant case, the license agreement did not require Record Club to sell UAR recordings to the exclusion of all others (Exh. A), and Record Club used a number of license agreements at the same time, both before and after United Artist's repudiation. In United Artist's pre-trial papers, UAR asserted that Record Club could not have promoted both UAR recordings and other recordings at the same time because the cost of expanding the Disc and Tape Guide was prohibitive. At trial, however, Record Club established the relatively insignificant expense of expanding the Disc and Tape Guide (Tr. 72–73). Thus, there is no reason to reduce Record Club's damages on account of the claimed substitution effect.

■ UAR takes issue with the manner in which Record Club calculated its allocable expenses. In calculating its advertising expenses, Record Club considered certain expenses fixed because they continued at the same level even though Record Club reduced and later eliminated UAR listings. These included postage, the cost of envelopes and the cost of inserting promotional pieces in the envelopes (Tr. 69–71). In addition, it included the cost of binding the Disc and Tape Guide, the cost of the cover page, the order form and the miscellaneous page, as well as the printer's make-ready and press-time charges, which remained the same regardless of the number of pages in the Disc and Tape Guide, all of which amounted to approximately 35% of the cost of printing the Disc and Tape Guide.

Under the governing legal principles, the only expenses which are to be charged against the plaintiff are those expenses that the defendant's breach has made unnecessary. *Paper Converting Machine v. Magna–Graphics*, 745 F.2d 11, 22 (Fed.Cir. 1984); *Vitex Manufacturing Corp. v. Caribtex Corp.*, 377 F.2d 795, 798 (3d Cir.1967);

*R & I Electronics, Inc. v. Neuman*, 66 A.D.2d 836, 411 N.Y.S.2d 401 (2d Dep't 1978); 5 Corbin, *Contracts* § 1038 (1964). Since the expenses listed above did not diminish as a result of the breach, Record Club was correct not to subtract those expenses from its damage claim.

The authority that UAR cites to the contrary is inapposite. *See Martin Motor Sales, Inc. v. Saab–Scania of Am. Inc.*, 452 F.Supp. 1047, 1053 (S.D.N.Y.), *aff'd*, 595 F.2d 1209 (2d Cir.1979). In that case the advertising expense in question varied directly with the number of cars sold—the defendant paid the plaintiff $250 per car to advertise the defendant's automobiles. Here, there is no such direct relationship between expenses and the number of recordings advertised.

■ UAR also objects to Record Club's projection of 1972 figures for cost of goods sold into future years when the actual costs for those years increased. Record Club concedes that actual costs did increase in subsequent years, but points out that record price increases more than offset the increase in costs. As Record Club demonstrated in its post-trial papers, the evidence bears this out. Using evidence admitted at trial, Record Club recalculated its lost profits using actual costs and prices and produced a slightly greater figure for lost profits. Although this demonstrates that Record Club's methodology is not mathematically perfect, the imperfection does not prejudice defendants, and therefore should not preclude an award of damages.

UAR contends that Record Club's calculation of revenues during the base period is distorted as well. This purported distortion derives from certain sales promotions in which Record Club offered one free recording for every recording purchased at list price. UAR asserts that this falsely inflated the sales revenues. Record Club, however, included the cost of all free recordings in calculating its net profits. Therefore, the distribution of free recordings did not inflate Record Club's calculation of net profits during the base period. Since lost profits were projected from net profits rather than gross sales revenues,

the calculation of lost profits was not distorted.

■ Record Club seeks to inflate its sales during the base period by an additional 50% on the theory that UAR's poor service in the base period caused Record Club to list fewer UAR recordings in its catalogue and accordingly to make fewer sales of such recordings than they would have if UAR had rendered full performance under the agreement. In support of this claim, Record Club presented, through the testimony of an expert witness, a regression analysis which sought to demonstrate a direct correlation between increased listings in the Disc and Tape Guide and increased sales.

There is no credible evidence, however, as to how many UAR recordings Record Club would have listed had it not been for the bad service. Record Club undoubtedly "skimmed the cream" and listed in its Disc and Tape Guides the recordings it believed would be most popular. Even if UAR's service had been perfect, Record Club presumably would not have listed recordings for which it did not anticipate significant demand. Record Club has not proven that there were additional, equally popular UAR recordings that it would have listed.

Obviously, the extrapolation of a linear relationship between an increased number of listings and an increased volume of sales depends on two assumptions: (1) that the added selections, on average, will be equally as popular as those already listed, and (2) that there is a sufficient unfilled purchaser demand to absorb the additional supply without diminution of demand for previously listed selections. On the evidence submitted, the Court cannot make either of these assumptions.

Record Club also has failed to prove its claim for the loss of prospective members. This claim has two components: (1) lost membership fees paid by members who would have joined Record Club but for UAR's breach; and (2) lost profits on the anticipated purchases of non-UAR recordings by such members.

■ When new members purchased their memberships, they were entitled to select a certain number of recordings. Record Club's calculations assume that new members who selected UAR recordings joined because of the availability of UAR recordings, and that comparable numbers of new members would have continued to join if UAR recordings had been available. This is purely speculative. It is equally logical to assume that if UAR recordings had not been available, many if not all of these new members would have joined anyway, and selected non-UAR recordings. Consequently, there can be no recovery for the membership fees and sales that the assumed additional new members would have generated.

■ Nor may Record Club recover on its claim for lost customer-list rental fees and advertising-insert income. These are items of consequential damages in that the loss does not arise out of the immediate transaction between the contracting parties, but rather stems from losses incurred by Record Club in its dealings with third parties. *437 Madison Ave. v. A.T. Kearney, Inc.*, 127 Misc.2d 37, 488 N.Y.S.2d 950, 951 (N.Y.App.Term 1985). Consequential damages are not recoverable unless there is proof that they were within the contemplation of the parties at the time they entered into the agreement. *Deutsch v. Health Ins. Plan of Greater New York*, 751 F.2d 59, 67 (2d Cir.1984); *Starmakers Pub. Corp. v. Acme Fast Freight, Inc.*, 646 F.Supp. 780, 782 (S.D.N.Y.1986); *Kenford Co., Inc. v. County of Erie*, 67 N.Y.2d 257, 502 N.Y.S.2d 131, 132, 493 N.E.2d 234, 235 (1986). Record Club did not submit any evidence showing that UAR knew that Record Club derived income from renting its lists or form inserting advertisements in its mailings.

In addition, this claim fails for lack of adequate proof. Record Club simply assumed that UAR's share of list rental and insert income was equal to UAR's share of Record Club's total distribution of recordings. Record Club did not present any evidence to support this assumption.

UAR has successfully challenged a number of Record Club's damage claims. Nevertheless, sales during the base period, reduced by 5.5% and projected throughout the term of the agreement is a reasonably certain measure of the value of the UAR license. During the base period, Record Club's net profit on sales of UAR recordings was $464,527.57. Adjusted downward by 5.5% and projected from the end of the base period to the end of the two-month sell-off, a span of two years and five months, this equals $2,998,223.60.

■ In projecting its damages forward, Record Club recognized that as a result of the breach it was able to eliminate certain expenses which it would have incurred had UAR fully performed. Therefore, Record Club deducted the saved expenses from its damage claim. Record Club identified two areas in which it was able to reduce its expenses: (1) "sunk" costs; and (2) sales promotion expenses.

Record Club's sunk costs consisted of those costs that it was unable to adjust immediately to accommodate short-term economic changes, but that it could eventually adjust to accommodate long-term changes. Thus, in the first year following the breach Record Club did not make a deduction for sunk costs, but it deducted $67,399.58 in fiscal 1974, and deducted another $95,484.98 f r the period from the end of fiscal 19í4 until the end of the sell-off, for a total deduction of $162,884.56.

The deduction of sales promotional expenses represented a change in marketing strategy following the breach. Record Club recognized that older members of the club had lower response rates to mailings than did newer members. Accordingly, Record Club reduced the number of mailings it sent to older members and increased the number of mailings to newer members. Record Club initially calculated that this resulted in a savings of $43,966.10 in fiscal 1973, $62,910.08 in fiscal 1974, and another $89,124.71 for the period from the end of

fiscal 1974 until the end of the sell-off, for a total deduction of $196,000.89.

At trial, Record Club pointed out that it was a mistake to deduct the savings on promotional expenses from the damage award because the reduction in mailings was not due to the breach, but was the result of an unrelated change in marketing strategy. Accordingly, Record Club sought to withdraw this deduction. While Record Club is correct that this item should not be deducted, it would be manifestly unfair to allow Record Club to change its calculations so drastically during the trial. This represents more than a change in methodology—it is a change in theory and defendant could not have been prepared to respond to it at trial. Accordingly, this item will be deducted from the damages along with the sunk costs, leaving $2,639,338.30.

Record Club had similar savings in its new member acquisition program in fiscal years 1974 and 1975, and continuing through the sell-off. During these years Record Club increased the number of so-called free recordings it distributed to new members. Had it not been for UAR's breach, Record Club would have distributed more UAR recordings as new-member-frees. Thus, the breach resulted in savings that must be deducted from the proven damages. In fiscal 1974 these savings amounted to $73,792.60, and in the period from the end of 1974 through the sell-off the savings amounted to $104,541.97 for a total deduction of 178,334.57. This further reduces damages to $2,461,003.80.

Record Club claims nine separate items of miscellaneous damages.[4] UAR concedes two of these claims: (1) a claim for defective tapes in the amount of $181.38, and (2) a claim for defective LPs in the amount of $1,299.80, totalling $1,481.18. As to the remaining claims UAR asserts that they fail either for lack of competent proof or because they are outside the scope of the agreement.

4. Record Club had an additional claim of $6,943.59 for an item entitled Phonodisc pur-chases it withdrew at trial.

The first miscellaneous item that Record Club claims is for licensed recordings that it purchased on a non-licensed basis from one of UAR's distributors as a substitute for recordings that were unavailable as a result of the breach. On cross-examination, however, Record Club's principal witness admitted that some of the purchases might have been of recordings which were not within the license agreement, and that other purchases might have been below the minimum number required under the license agreement (Tr. 376–77). Because of these admitted inaccuracies in the calculation of this item, Record Club has not provided a reasonably certain basis for awarding this item of damages. Accordingly, this claim is denied.

Record Club also claims damages of $20,-264.39 for UAR recordings that Record Club was unable to sell because of UAR's repudiation of the agreement. This figure represents the prices that UAR charged Record Club for those recordings. UAR argues that under the agreement Record Club was obligated to destroy any inventory left at the termination of the agreement and thus has no claim in this regard. If it were not for UAR's breach, however, it seems reasonably certain that Record Club would have been able to sell most, if not all, of this inventory. Thus, UAR is liable for this claim.

Record Club has claimed $1,422.85 for master tape purchases. These purchases were made pursuant to the agreement, which gave Record Club the right to purchase master tapes and produce recordings from those masters when it did not receive timely delivery from UAR. 643 F.Supp. at 930. As a result of the repudiation Record Club was unable to use them to any significant degree. Consequently, the purchase price should be refunded.

The next item is for tapes that Record Club purchased after the repudiation from Liberty/United Artists Tape Duplicating for resale to its members. Record Club had previously purchased master tapes from which it could have manufactured tapes for resale instead of purchasing them from Liberty/United Artists. Record Club asserts that as a result of the repudiation it reduced its advertising to the point where it received so few orders that it was not economically feasible to make a profit on the manufacture and resale of these tapes. Record Club claims that had it not been for the repudiation, it would have had so many orders that it could have manufactured the tapes for less money than it paid Liberty/United Artists, and therefore would not have purchased the tapes. Accordingly, Record Club claims it is entitled to the difference between the purchase price and its manufacturing costs. There has been no proof, however, that increased advertising would have increased sales enough to make it economically feasible to manufacture the tapes rather than purchase them from Liberty/United Artists. Thus, Record Club may not recover on this claim.

Record Club also has asserted a claim for left-over tape labels that it had purchased in anticipation of manufacturing its own recordings. At trial, Record Club failed to establish adequately the number of labels remaining, asserting only that "a lot" were left. This is an insufficiently precise measure of damages.

Similarly, Record Club has claimed that UAR's failure to provide recordings in a timely manner, combined with their failure to provide certain master tapes, caused Record Club to suffer increased costs. At trial, however, Record Club's principal witness admitted that the claim was probably inflated, and that he was unable to estimate the degree of inflation. Accordingly, there is no reasonably certain basis for awarding damages on this claim.

The final miscellaneous expense is for administrative costs of $7,500 caused by the breach. This is essentially an estimate of the number of executive hours spent trying to persuade UAR to comply with the agreement. Record Club did not produce documentation of these hours. Instead, Record Club's president, who was involved in the negotiations, testified that the estimate was based on his recollection of the hours and expenses involved. This is an insufficient basis upon which to grant the claim.

The total amount of allowed, miscellaneous damages is $23,168.42. This brings Record Club's proven damages to $2,484.172.20.

Record Club of America had a Canadian subsidiary which was entitled to use the UAR license. Record Club calculated the damages for its Canadian subsidiary in essentially the same manner as for its U.S. operations except that it used a nine-month base period as opposed to a six-month base period.

Record Club claims a net profit of $76,-005.09 on the sale of UAR recordings during the base period, but lost $24,584.45 on the distribution of recordings through the membership acquisition process. This brings the net profit during the base period to 51,420.64. Annualized, this comes to $68,543.71, and it represents the amount of lost profit for fiscal 1973. In fiscal 1974, sunk costs allocated to UAR dropped as a result of the breach, and this is reflected in a deduction of $27,527.07, leaving net profits for 1974 of $41,016.64. From fiscal 1975 through the sell-off period, a span of seventeen months, the sunk costs were the same on an annual basis as for 1974, and therefore the annual net profit was the same. Projected over the entire seventeen-month period, the net profit amounts to $58,108.28. Thus, the total projected lost profit for the Canadian subsidiary is $167,-668.53.

UAR argues that because the Canadian subsidiary actually suffered a loss on UAR recordings in 1974, there is no basis upon which to award damages for that year. Actual performance after the breach, however, is not a reasonable basis upon which to calculate damages when, as here, data are available on the pre-breach period, because performance post-breach is necessarily hindered by the breach.

UAR also claims that sales dropped after the breach because advertising expenses dropped. UAR did not make this claim at trial, so Record Club was not able to rebut it. In its post-trial papers, however, Record Club asserts that if it had been confronted with this claim at trial it would have shown through exhibit 51, marked for identification, that Record Club increased its promotional mailings despite the drop in advertising. Moreover, Record Club asserts, it would have shown that it had reduced its advertising by limiting its advertisements to magazines with both Canadian and U.S. distribution, since it found that advertisements in exclusively Canadian magazines did not increase new members enough to justify the cost. Thus, the reduction in advertising expenses would not have led to a significant drop in sales. Accordingly, Record Club is entitled to damages based on its Canadian operations in the amount of $167,668.53, bringing its total damages to $2,651,840.80.

After United Artist's repudiation, Record Club actually realized profits on its distribution of UAR recordings in the United States in the amount of $161,341.45. Damages should be reduced accordingly, bringing the total to $2,322,830.90. UAR claims it is entitled to an additional credit of $18,-396.08, representing the amount that Record Club saved by purchasing recordings and, through the plan of arrangement in bankruptcy, paying only part of the purchase price. UAR did not plead this claim and never before asserted it in the case. Accordingly, the credit is denied.

 Record Club's claim for the loss of its value as a going concern is dismissed. Counsel argued this point on the first day of trial, and although they disagreed as to the exact figure, plaintiff conceded that UAR recordings only amounted to approximately ten percent of Record Club's sales prior to the breach. Plaintiff asserted, however, that the UAR sales represented a far greater proportion of Record Club's profit. On the second day of the trial, the Court ruled from the bench that plaintiff was not entitled to recover damages for loss of its value as a going concern, and precluded evidence relating to this claim (Tr. 179). Since UAR was only one of many recording labels Record Club carried, it is far too speculative to attribute the failure of the business to UAR's breach. *Accord Deutsch v. Health Ins. Plan of Greater New York*, 751 F.2d 59, 68 (2d Cir.1984) (going concern value too specula-

tive when defendant had no reason to know that breach would result in loss of the going concern value of subcontractor in which plaintiff had an interest).

UAR has claimed a set-off of $120,000 for royalties that Record Club guaranteed for the first two-year option period. The Court has previously recognized the validity of this set-off. 80 B.R. at 278. In calculating its net profits, however, Record Club fully allocated royalties as an element of cost of goods. The allocated royalties exceed the guaranteed minimum royalty. To allow a separate set-off for guaranteed royalties would give UAR a double credit. UAR has claimed further set-offs in the amount of $179,756.66 and $805,123.42. Both claims are currently pending before the bankruptcy court. This Court will not rule as to their validity until the bankruptcy court has ruled.

### III. CONCLUSION

For the forgoing reasons, plaintiff is entitled to damages in the amount of $2,322,830.90, less any set-off that defendant is able to prove. The Court has reserved judgment on the validity of defendant's claimed set-offs for $179,756.66 and for $809,123.42, which are currently pending in the bankruptcy proceeding, until the bankruptcy court completes its proceedings with respect to those claims. Accordingly, judgment will be entered, pursuant to Rule 54(b), Fed.R.Civ.P., in the amount of $1,333,950.90, plus prejudgment interest, which represents Record Club's proven damages, less the claimed set-offs. A final judgment will be entered after the bankruptcy court has ruled on such set-offs. Settle judgment order on ten days' notice.

SO ORDERED.