Christopher SALES and Carol Sales, Plaintiffs,

v.

REPUBLIC OF UGANDA and Applo K. Kironde, as Ambassador and Permanent Representative of Uganda to the United Nations, Defendants.

No. 90 Civ. 3972 (CSH).

United States District Court, S.D. New York.

July 9, 1993.

Darrell K. Fennell, Fennell & Minkoff, and Mark Krassner, Cohen & Krassner, New York City, for plaintiffs.

Jeffrey H. Hirsch, Sheft & Sheft, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In a Memorandum Opinion and Order dated December 28, 1992, familiarity with which is assumed, the Court granted defendants' motion to vacate a default judgment previously obtained by plaintiffs, on condition that defendants post security in the amount of damages found by Magistrate Judge Grubin after an inquest, together with interest.

On April 5, 1993 Judge Grubin filed her Report and Recommendation. The inquest into damages had commenced within the context of the default judgment previously entered by this Court. Judge Grubin's initial responsibility was to conduct an evidentiary hearing and report on the amount of the plaintiffs' damages, so that judgment in a sum certain could enter in plaintiff's favor. That mission was altered by this Court's December 28, 1992 opinion conditionally setting aside the default judgment. Following that opinion, the function of Judge Grubin's recommendation was to fix the amount of the security upon which vacatur of the default judgment would be conditioned.

In a comprehensive opinion Judge Grubin has calculated plaintiffs' damages, and accordingly the amount of security defendants would be required to post, at $2,137,245.26. Judge Grubin reviewed the factual and expert opinion testimony, accepted some of that testimony, but rejected other aspects of the plaintiffs' proof. It is apparent that plaintiff Christopher Sales, injured in a fall from a ladder while working at the Ugandan Mission in New York, suffered grievous, crippling, painful and permanent injuries.

The case is now before the Court on defendants' objections to Judge Grubin's Report and Recommendation; and on defendants' motion for reconsideration of this Court's December 28, 1992 Opinion, insofar as it required defendants to post security. Defendants revert to that subject again in their objections to Judge Grubin's report.

Plaintiffs' defend Judge Grubin's Report and Recommendation, and contend that defendants must give security in the amount of the damages which she calculated.

Judge Grubin's Report and Recommendation does not furnish an appropriate vehicle for defendants to revisit the propriety of this Court's direction that defendants post security to vacate the default. That was not an issue which I referred to the Magistrate Judge, and she perforce accepted my ruling as the law of the case.

However, the defendants did file a timely motion for reconsideration on the security issue following this Court's December 28, 1992 opinion, the time for briefing and filing of formal papers having been extended by stipulation of the parties.

It is also fair to say that, the giving of security having been first raised by this Court *sua sponte* in the December 28, 1992 Opinion at slip op. 10, the present procedural posture of the case is that of cross-motions: defendants moving by way of reargument to do away with the requirement of posting security, and plaintiffs cross-moving for the posting of security in the amount of $2,137,-245.26, determined by Judge Grubin to represent plaintiff's recoverable damages.

With respect to defendants' objections to the amount of damages determined by Judge Grubin, I reject the objections and approve the amount, substantially for the reasons set forth in Judge Grubin's careful analysis. Defendants' objections are for the most part conclusory and without support in any authority.

Thus defendants contend that the awards for Christopher Sales' loss of earn-

ings and Carol Sales' derivative claim are "excessive under the circumstances," without saying why that is so or suggesting a different figure. While it is true that the award to Christopher Sales for pain and suffering is in a range generally involving more severe injuries, as Judge Grubin recognized in her opinion at slip op. 24, the amount is not so great as to shock the conscience of a reviewing court. Judge Grubin had the opportunity of observing plaintiff Christopher Sales and forming an opinion as to the extent of his suffering, past, present and future, which given the nature of his injuries is undoubtedly severe.

■ While I reject certain objections defendants make to Judge Grubin's calculations, I agree with defendants that interest should not run from September 30, 1991, the date of entry of default against the defendants. The default related to liability only, with the amount of damages (upon which interest may then be calculated) to be determined subsequently. Since federal jurisdiction in this case is premised on diversity and the right to interest on a cause of action qualifies as a substantive right, the question is governed by New York law. *See Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir.1984). The New York rule on personal injury claims is that "no interest at all may be awarded until at least a verdict (in a jury trial) or a decision (in a bench trial) is rendered." Siegel, *Practice Commentaries*, N.Y.CPLR § 5002 (McKinney's 1992). In the case at bar, Judge Grubin's Report and Recommendation following inquest is the functional equivalent of a verdict or decision setting forth the amount of plaintiffs' damages. The awarding of interest prior to that time is contrary to New York law. The amount involved is approximately $266,000. Accordingly, the calculation of plaintiffs' damages for the purpose of posting of security will be reduced by that amount, from $2,137,245.26 to $1,871,245.26.

■ I now turn to defendants' motion to be relieved of the necessity of posting security. Because this Court added that condition *sua sponte*, the parties had not briefed the issue prior to the December 28, 1992 opinion. Accordingly the usual strictures on motions

for reargument contained in Civil Rule 3(j) of this Court may be relaxed. I have considered the question *de novo*.

This Court's order directing the posting of security as a condition for vacatur of the default judgment was based on *First Fidelity Bank, N.A. v. The Government of Antigua and Barbuda—Permanent Mission*, 877 F.2d 189, 196 (2d Cir.1989). That case arose out of a loan to pay for the renovation of Antigua's Permanent Mission to the United States in New York. Antigua, like the Republic of Uganda in the case at bar, is a foreign state. Actions in United States Courts against foreign states are governed by the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1330, 1602–1611.

In *First Fidelity* the plaintiff bank filed suit in this Court to recover the balance owing on the loan, and served the Government of Antigua in accordance with the provisions of the FSIA. Antigua did not answer the complaint, although it conceded that it was properly served. The circumstances are the same in the case at bar. Plaintiff Christopher Sales having been injured on the premises of the Permanent Mission of Uganda to the United Nations, counsel for plaintiffs in April 1991 caused the Clerk of the Court to send notice of the action as proscribed by the FSIA to the Government of Uganda at its capitol city of Kampala. Uganda has never denied that it was properly served.

In the *First Fidelity* case, Antigua did not answer the complaint. The bank obtained a default judgment. The then ambassador of Antigua to the United Nations thereupon entered into an acknowledgement of debt and settlement agreement. Upon default of the payments called for by the settlement agreement, the plaintiff bank attached bank accounts of Antigua's Permanent Mission in New York and its embassy in Washington, D.C. These steps prompted the Government of Antigua to take its first direct action. Antigua moved in the district court to dismiss the bank's complaint for lack of subject-matter jurisdiction, on the ground that the then Ambassador lacked the authority to bind his Government to the loan or to the settlement agreement. Those contentions, if

correct, would permit Antigua to defend on the ground of sovereign immunity from suit. On the other hand, as the Second Circuit observed, if Antigua was simply "trying to renege on a loan by disowning its agent who borrowed the money," then "the FSIA's commercial activity exception would strip Antigua of its sovereign immunity, and the district court would have subject matter jurisdiction. The default judgment would be valid, and the consent order would be enforceable." 877 F.2d at 195–96.

In these circumstances, the Second Circuit held that the district court should have granted Antigua's motion to set aside the default under Rule 60(b)(6), the catch-all provision permitting consideration of "any other reason justifying relief from the operation of the judgment." Stressing that "[c]ourts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside," and that "the fusion of substantive and jurisdictional issues also militates in favor of settling aside the default judgment" against Antigua, the Second Circuit set aside the default and permitted Antigua to defend on the merits, in an effort to establish its sovereign immunity.

However, the Second Circuit went on to say:

At the same time, First Fidelity's rights must be protected, for there is some evidence that Antigua responded to this lawsuit only when First Fidelity began to grasp its assets. Rule 60(b) provides for relief "upon such terms as are just."

*Id.* at 196.

Accordingly the court of appeals vacated the default judgment and remanded to the district court for further proceedings "on the condition that Antigua post a bond covering the amount claimed by First Fidelity, including interest." *Id.*

Uganda's conduct in the case at bar is comparable to that of Antigua in *First Fidelity.* Uganda made no response to the summons and complaint, properly served upon that Government under the FSIA no later than May 1991. Although not required to do so, in September 1991 Judge Grubin sent to the Government in Kampala a letter advising Uganda of the inquest date of October 24, 1991 and advising Uganda of its right to attend and present evidence. Uganda did nothing in response, except that on October 24, 1991 the permanent mission contacted the United States Mission of the United Nations, asking the United States Mission to "liaise with the relevant authorities as appropriate." Uganda did not move to vacate the default until July 1992.

Uganda has on at least one prior occasion disregarded process issued by a United States court. In *Foxworth v. Permanent Mission of the Republic of Uganda to the United Nations,* 796 F.Supp. 761 (S.D.N.Y. 1992), an elderly woman was struck by an automobile owned by the Permanent Mission and severely injured. Uganda failed to answer the complaint and Judge Mukasey entered a default judgment in the amount of $250,120 which Uganda failed to satisfy. A writ of attachment was subsequently entered against a bank account maintained by the permanent mission in New York City. As Judge Mukasey noted, "[e]vidently, the attachment of its bank account convinced defendant that plaintiff's claim and the proceedings before this Court warranted its attention." *Id.* at 762. Uganda, with the diplomatic support of the United States Department of State, obtained the lifting of the attachment in accordance with provisions of treaties then in force. *Id.* at 762–63. Judge Mukasey saw fit to remind Uganda that, despite the lifting of the attachment, "there remains an outstanding judgment pursuant to which it is liable to plaintiff in the amount of $250,120." *Id.* at 764. The Court records reflect that subsequently Judge Mukasey vacated the default, allowed Uganda to defend on the merits, and gave judgment to plaintiff against the Permanent Mission in the amount of some $90,000: a judgment which Uganda has thus far failed to pay, although taking no appeal.

Given Uganda's demonstrated propensity to disregard process issued by United States Courts, and its refusal to pay lawful judgments, I think it entirely fair to require that the claims of plaintiffs at bar be secured as a condition to permitting vacatur of the default judgment. It is the same fair result that the

Second Circuit reached in granting Rule 60(b) relief to Antigua in *First Fidelity.* Uganda says that *First Fidelity* is distinguishable because the damages in that action to recover a loan were liquidated in amount, whereas plaintiffs' tort damages are not liquidated (Uganda having not participated in the inquest before Judge Grubin). But Uganda chose not to participate in that inquest, and cannot profit by its own neglect. While Uganda is entitled to litigate both liability and damages if the default is vacated, the factual and medical evidence before Judge Grubin make it crystal clear that plaintiffs suffered severe damages. Their claims are sufficiently "liquidated" by Judge Grubin's careful findings to justify the giving of security in the amount previously referred to in this Opinion.

■ Uganda also argues that it should not be required to give security until its defense of sovereign immunity has been tested. But in that regard, this case is no different from *First Fidelity,* in which Antigua asserted sovereign immunity as the result of its Ambassador's asserted lack of authority to bind the Government. In *First Fidelity* the Second Circuit, applying concepts of fairness under Rule 60(b), conditioned Antigua's ability to vacate the default and assert sovereign immunity upon its securing the plaintiff's claim. I reach the same result in the case at bar.

■ Uganda refers in its briefs to the treaties which led to the lifting of the attachment in *Foxworth, supra,* and to the limitations placed by the FSIA upon attachments of a foreign state's property in aid of execution on judgments. *See* 28 U.S.C. §§ 1609–1611. The Second Circuit has also suggested that a district court order addressed to a foreign state to post security as a condition of adjourning the enforcement of a foreign arbitral award, as provided for by Article VI of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, *see* 9 U.S.C. § 201 note (West Supp.1993), may be regarded as the equivalent of an "attachment" of a foreign state's property within the meaning of the FSIA.

*Caribbean Trading and Fidelity Corp. v. Nigerian National Petroleum Corp.,* 948 F.2d 111 (2d Cir.1991). However, these considerations are not implicated by a foreign state's request for relief from a judgment under Rule 60(b). Such relief may be granted under the rule only "upon such terms as are just," and for the reasons stated I believe the requirement of security as a condition for vacatur is just and fair.

In these circumstances, the defendant Republic of Uganda is directed to post security in the amount of $1,871,245.26 as a condition for vacatur of the default judgment entered in this case. Defendant is directed to post that security within thirty (30) days of the date of this Opinion and Order, failing which plaintiffs may submit *ex parte* a default judgment in that amount. If Uganda posts security, it must respond to the complaint within thirty (30) days thereafter.

The foregoing is SO ORDERED.

### REPORT AND RECOMMENDATION TO THE HONORABLE CHARLES S. HAIGHT, JR.

GRUBIN, United States Magistrate Judge:

### BACKGROUND

In September 1991 your Honor directed entry of a default judgment herein against the defendants, who had failed to answer or otherwise appear, and referred the case to me for a determination of the damages to be awarded to the plaintiffs. On October 24, 1991 I held an inquest at which plaintiffs presented evidence on damages. The defendants did not appear at the inquest or otherwise communicate with the court, despite our having sent letters addressed to each of them in Kampala, Uganda in September informing them of the inquest date and advising them of their right to attend and present evidence. Apparently, however, on the day of the inquest the Permanent Mission of the Republic of Uganda to the United Nations contacted the United States Mission, requesting the latter to "liaise with the relevant authorities as appropriate."[1] Thereafter, defendants

---

1. Memorandum Opinion and Order of your Hon-

or dated December 28, 1992, quoting Exhibit B

moved to vacate the default judgment. For the reasons thoughtfully explained in your Memorandum Opinion and Order dated December 28, 1992 ("Opinion") and supplemented by a Memorandum Order of January 26, 1993, your Honor granted the motion to set aside the default on the condition that defendants post security for plaintiffs' claim. Rather than require them to post the very large amount of damages demanded in the complaint, however ($50,000,000.00 for Christopher Sales and $10,000,000.00 for Carol Sales), your Honor directed that I complete a report and recommendation on the amount of plaintiffs' provable damages and that defendants post that amount prior to proceeding to defend the case on the merits.

■ Accordingly, this report and recommendation contains my findings and conclusions on the issue of damages. It is rendered on the basis of the legal standards applicable to default judgments and, of course, without the benefit of any evidence or argument having been presented on the issue by defendants. Upon entry of a default judgment, the well-pleaded allegations of a complaint are to be accepted as true, except those relating to the amount of damages. *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981); *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir.1974); *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69–70 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

## FACTS

At the inquest four witnesses testified: plaintiff, Christopher Sales; his treating physician, Joseph C. Andolino; plaintiff's wife and co-plaintiff, Carol Sales; and a rehabilitation and vocational analyst, Dr. Valerie J. Ellien. The following statement of facts is based on the complaint and those portions of testimony that I found credible. While employed by Henry Restoration Ltd. and performing caulking work on the exterior of the premises owned by the defendants at 336 East 45th Street, New York, New York, the ladder which plaintiff[2] was using started to

move as a result of defendants' negligence, causing plaintiff to fall from the ladder 30 to 35 feet to the ground. Plaintiff landed erect on his feet, crushing the ankle/heel bones on both feet. He was taken that day, February 2, 1990, to Bellevue Hospital and transferred ten days later to a hospital in New Jersey closer to his home. Dr. Andolino, a Board-certified orthopedic surgeon, first examined plaintiff on February 12, 1990 and remains his treating physician. Plaintiff at that time was wearing a soft cast and a back brace. His x-rays showed comminuted interarticular fractures of the heel bones into six to eight pieces on each foot, multiple fractures of his lumbar spine and a tear in the major medial cartilage of his left knee. These injuries were consistent with the fall from a height that plaintiff described. The pain was so severe as to require intermuscular narcotic medication around the clock. Initially in February 1990, Dr. Andolino performed arthroscopic surgery on the knee to remove damaged tissue. Plaintiff wore a lumbar thoracic brace until August 1990. At that time Dr. Andolino performed arthrodesis (fusion procedure) in which he took bone from plaintiff's pelvis and inserted it into plaintiff's left heel to reconstruct destroyed bone. In January 1991 the same surgical operation was performed on the right foot. After each surgery plaintiff wore a cast for about three months and throughout that time was unable to walk and confined to bed or a wheelchair.

Dr. Andolino explained at the hearing that surgical procedures had accomplished as much as could be expected and that no additional surgery is planned. He testified that plaintiff's injuries are permanently fixed and will not respond in any appreciable way to further medical treatment. While physical therapy could alleviate his pain, it will not change his functional capacity on a permanent basis. Plaintiff will be unable ever to walk normally. His feet show "compression with the heel bone being quite retracted and crushed on both sides." (Report dated October 8, 1991, admitted as Exhibit 2.) The doctor related that when people have one foot crushed, they are generally lost to the

---

to the Affidavit in Support of Motion to Vacate Default Judgment.

2. "Plaintiff" in the singular will be used to refer to Mr. Sales except as otherwise noted.

work force in terms of walking, climbing ladders or doing any heavy manual work. Plaintiff has suffered destruction of the bones in both feet, and his problems are compounded even more by the multiple compression fractures in his back. His work capacity, therefore, will be limited to use of his upper extremities in a sitting position. He is unable to lift objects heavier than ten or fifteen pounds. At the time of the hearing plaintiff was ambulatory for short distances with the use of a walker or cane. Plaintiff testified that he tries to walk without any aids, but after about a block the pain becomes too severe. He tries to accompany his wife to do shopping, but must use a wheelchair. Dr. Andolino said plaintiff will always have pain; some days will be better than others, but the more he tries to exert himself, the more he will suffer afterwards. While plaintiff continually asks Dr. Andolino for pain medication, the doctor now refuses to allow him anything stronger than Advil or Tylenol because of the problems of potential addiction.

Plaintiff was married in July 1985 and has a son who was eight months old at the time of the accident. He and his wife had planned to have one or two more children, but the accident has made fulfillment of their plans unlikely. Plaintiff has been unable to engage in sexual intercourse since the accident. He spends most of his day on a couch with constant pain in both feet and, apparently, intermittent pain in his back. He explained that when he stands on his feet the pain goes up his legs and into his back. He is, however, unable to stay seated for lengthy periods because of the back pain. Plaintiff had a relatively active lifestyle prior to the accident. He has five brothers and engaged in various sports on weekends. He says he liked being a construction worker because it kept him fit and allowed him to work outdoors.

Mrs. Sales works as an assistant manager at New Jersey Bell Telephone Company. When she is not at work or doing shopping for the family, she stays home doing chores and tending to plaintiff. She has not gone out for fun or relaxation "for even an hour" since the accident. (Transcript of inquest, p. 50.) While she is at work, her mother and father, aged 66 and 71, come to stay with plaintiff and their young grandson because plaintiff cannot take care of the boy by himself. He is unable to run or even walk after him. He does some cooking for his son, but must kneel or sit on a chair by the stove to do so. He bathes him in the kitchen sink because he cannot bend over the bathtub.

Dr. Valerie J. Ellien is a "rehabilitation counselor and a vocational economic analyst" (Transcript of inquest, p. 18) with impressive credentials, including a master's degree in rehabilitation assessment, a doctorate in rehabilitation counseling and postdoctoral studies in economics. She is certified as a diplomate by the American Board for Vocational Experts. She has worked at varied jobs in the rehabilitation counseling field and was an associate professor in New York University's Department of Rehabilitation Counseling, specializing in the placing of disabled people. She currently maintains her own private practice. Her expertise lies in knowledge of the physical and intellectual demands of jobs in the workplace and the effects of disabilities on jobs. She also claims an expertise in "how to project lost earnings," requiring an "understanding of wage growth and interest rates, the relationship between those in determining lost capacity to earn money." (Transcript of inquest, p. 19.)

Dr. Ellien was retained by plaintiff to compute his loss of future earnings. To do so, she took into account the following. Plaintiff was 30 years old at the time of the hearing and had only a ninth-grade education. He had worked twelve years as a construction worker, earning a yearly salary of $30,000–$31,000 prior to the accident. Dr. Ellien assessed plaintiff's work capabilities to be those in an unskilled or semiskilled category and, as limited by the injury, to those of a sedentary nature. Then, using Bureau of the Census statistics, she determined that unskilled to semiskilled sedentary jobs represented less than 1% (0.44%) of the labor market in the New York–New Jersey metropolitan area. This small percentage of jobs in this category leads Dr. Ellien to conclude that plaintiff is essentially unemployable or "100% occupationally disabled as a result of

injury." (Report dated October 14, 1991, admitted as Exhibit 3, p. 1.) [3]

Dr. Ellien concluded that plaintiff's lost earnings over his lifetime will be $1,313,-446.93. She arrived at this figure on the basis of the following data and assumptions: (1) his earnings as a Journeyman Mechanic in his union at the time of his injury would have yielded $39,706.16 for 1990 and, on the "assum[ption] that future increases in real wage growth will be offset by the real rate of interest or discount over the remaining work-life expectancy" (Exhibit 3, p. 2), the same figure should be used for subsequent years; (2) an additional 20% should be added apparently to represent the value of fringe benefits; (3) based on Bureau of the Census statistics applicable to non-disabled 30-year-old males with plaintiff's educational level, plaintiff's work-life expectancy at the time of his injury was 27.566 years.

Plaintiffs request the following damages: lost wages in the amount found by Dr. Ellien, $1,313,446.93; $10,000,000.00 to plaintiff Christopher Sales for past and future pain and suffering; and $3,000,000.00 to plaintiff Carol Sales for loss of consortium.

## CONCLUSIONS OF LAW

Initially, we must determine what forum's laws of damages should be applied to this case because federal law and New York state law would yield different results, largely because of differing concepts of discounting awards for future damages, application of interest rates and the manner in which judgments are to be calculated for payment.[4] For example, while a plaintiff under federal law is entitled to immediate payment of a judgment, under New York law he or she receives only a specified lump sum upon entry of a judgment with periodic payments of the remainder over the course of what could be many years. This New York "structured judgment" scheme, which will be discussed fully below, enables a defendant to satisfy a judgment with a far less monetary amount

than would be due under federal law. The question turns on the jurisdictional basis for this action. Plaintiff rests jurisdiction herein on the Foreign Sovereign Immunities Act of 1976 ("FSIA") (codified as amended in 28 U.S.C. §§ 1330, 1332(a)(4), 1391(f), 1441(d), 1602–11).

■ The exceptions set forth in the FSIA provide the sole bases for obtaining jurisdiction over a foreign state in United States courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434, 443, 109 S.Ct. 683, 688, 693, 102 L.Ed.2d 818 (1989); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488–89, 103 S.Ct. 1962, 1968–69, 76 L.Ed.2d 81 (1983); *see* 28 U.S.C. §§ 1330(a, b), 1604–08. Section 1606 of the FSIA provides in pertinent part:

> As to any claim for relief with respect to which a foreign state is not entitled to immunity ..., the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances....

Under § 1606, the general rule is that the court is to apply state substantive law to FSIA claims. *Barkanic v. General Admin. of Civil Aviation*, 923 F.2d 957, 959–60 & n. 2 (2d Cir.1991). *See also First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2597 n. 11, 77 L.Ed.2d 46 (1983) (under § 1606, "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances"). While in matters involving peculiar considerations of international relations, application of state law may yield to that of federal law, there appear to be no such countervailing considerations in this case. *See, e.g., Barkanic v. General Admin. of Civil Aviation*, 923 F.2d at 959–60 & n. 2. Therefore, New York law on damages must be applied. *See Woodling v. Garrett Corp.*, 813 F.2d 543, 557 (2d Cir. 1987); *In re Joint Eastern & Southern*

---

**3.** Dr. Ellien seems to have based her conclusion on the percentage of the labor force engaged in jobs of the defined categories. What raw number of jobs that percentage represents, however, was not put into the record.

**4.** It is unclear which, if any, plaintiff has employed in determining his damages request. He has not addressed the choice of law issue and the conclusory figures he proposes give little guidance as to method.

*Dists. Asbestos Litig.,* 798 F.Supp. 940, 961 (E. & S.D.N.Y.1992); *Alisandrelli v. Kenwood,* 724 F.Supp. 235, 242 (S.D.N.Y.1989).

Under New York law, plaintiff is entitled to compensation for loss of past earnings, for loss of future earnings and for past and future pain and suffering, and co-plaintiff Mrs. Sales is entitled to compensation for the loss of her husband's services and society. *See* N.Y.Civ.Prac.L. & R. §§ 4111(f), 4213(b) (McKinney 1992); PJI 2:280, 2:280.1, 2:290, 2:300, 2:301, 2:315 (1974 & 1991 Supp.); *Millington v. Southeastern Elevator Co.,* 22 N.Y.2d 498, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968).[5] The trier of fact must itemize a damages award into amounts representing these categories of damage, N.Y.Civ.Prac.L. & R. §§ 4111(f), 4213(b), and the determination of future damages is to be made without reduction to present value. *Id.* Upon the determination of these items of damage, Article 50–B of the New York Civil Practice Law and Rules, known as New York's "structured judgment" provisions, control the method, timing and amounts of payments. §§ 5041–5049 (McKinney 1992).

Under § 5041 (referred to recently by a state court as "every judge's nightmare," *Rohring v. City of Niagara Falls,* 153 Misc.2d 1001, 584 N.Y.S.2d 513 (Sup.Ct. Niagara Co.1992)), the court is to enter judgment for a damages award as follows. First, a lump sum is to be entered consisting of the amount found owed for all lost past earnings and past pain and suffering and up to the first $250,000 of lost future earnings and pain and suffering. (The proportions of the $250,000 representing earnings vis-à-vis pain and suffering are to be determined by the percentage each of those elements bears to the total award for future damages found by the trier of fact.) Also included in this lump sum are that portion of the plaintiff's attorney's fees related to past damages and an additional amount for the remaining attorney's fees related to future damages calculated on a basis that will be described below. The remainder of the judgment—*i.e.,* damages for future lost earnings and pain and suffering

beyond the first $250,000—is to be in the amount of the present value of an annuity contract that would provide for the payment of those future damages in monthly installments over the number of years for which the trier of fact found the plaintiff entitled to such damages, except that the pain and suffering payments must be calculated and paid over a period not to exceed ten years. The present value of an annuity contract is to be determined "in accordance with generally accepted actuarial practices by applying the discount rate in effect at the time of the award to the full amount of the remaining future damages." § 5041(e). The court, as part of its judgment, must require the defendant (and/or its insurance carrier) to offer and guarantee the purchase and payment of such annuity contract. The annual payment for the first year is calculated by dividing the amount of future damages by the number of years over which the payments are to be made, and each succeeding year's payment is determined by adding 4% to the previous year's amount.

As may have become apparent from the foregoing exegesis, the calculation of judgments in New York personal injury cases has become somewhat complex. (Indeed, there are additional further complicating aspects to it which I have omitted as not necessary for present purposes.) The statutory scheme was enacted in 1985 and 1986 as a response to burgeoning insurance premiums resulting from increasingly high verdicts. *See* Siegel, "Practice Commentaries" to Articles 50–A and 50–B, 7B *McKinney's Consolidated Laws of New York Annotated* (1992), pp. 711–14, 730–31. While it gives a plaintiff an immediate payment of a segment of damages, it structures remaining amounts into future periodic installments to strike a balance between moderating insurance premiums and providing adequate compensation to injured plaintiffs. *See Alisandrelli v. Kenwood,* 724 F.Supp. 235, 238–40 (S.D.N.Y. 1989). In the half-dozen years it has been operating, however, the statute has given the courts of New York quite a bit of trouble both because of the complexity in carrying

---

**5.** A plaintiff is also entitled to various other sums, such as unreimbursed medical expenses and other costs, but as plaintiffs here have not requested them nor submitted evidence of them, I have taken none into account.

out its express provisions and because of its failure to address additional issues that a court must address in carrying it out and fashioning a judgment pursuant to it.[6]

The remainder of this Report and Recommendation fixes the damages I find plaintiffs here should be awarded, itemized into the requisite categories, and then recommends the amount that I believe is appropriate for defendants to post as security at this time based upon the calculations required under Article 50–B which I have undertaken to do.[7]

*Lost Earnings*

■ In the absence of particularized evidence concerning future earnings, past earnings may serve as an adequate guide to loss of earning capacity, *see Earl v. Bouchard Transportation Co.,* 735 F.Supp. 1167, 1176 (E.D.N.Y.), *aff'd in part, rev'd in part on other grounds,* 917 F.2d 1320 (2d Cir.1990), and "[s]tatistical charts, such as the mortality tables and work-life expectancy table prepared by the United States Department of Labor … are often deemed authoritative" and are regularly used by the federal and state courts. *Id.* 735 F.Supp. at 1175; *see* New York Pattern Jury Instruction 2:290 and tables in 1 NY PJI2d Appendix B (1974 & 1991 Supp.).

Having been given no other relevant information, plaintiff's salary at the time of the injury and the work-life expectancy figure based on Bureau of the Census statistics and submitted by plaintiff's expert may be employed in the calculation of lost earnings. However, plaintiff has not offered a basis for including an additional 20% representing lost fringe benefits, since no evidence whatsoever has been submitted about the fringe benefits, if any, plaintiff enjoyed or that were available either to him specifically or to journeymen mechanics generally at the time of his injury. Indeed, the only reference to such benefits is Dr. Ellien's inclusion of a mysterious 20% under the word "Fringe" in the table attached to her report.

I have calculated the amount of lost earnings to which plaintiff is presently entitled as follows. Using the 1990 salary figure of $39,706.16 as earnings for the last eleven months of 1990 and the first nine months of 1991,[8] lost past earnings thus equal $66,176.93:

| | |
|---|---|
| 1990 (11 months) | 36,397.31 |
| 1991 (9 months) | 29,779.62 |
| | 66,176.93 |

Commencing with October 1991 and continuing through the remaining 25.9 years of plaintiff's work-life expectancy, the total for lost future earnings based on the same wage would come to $1,028,389.54 ($9,926.54 for the 3 months of 1991, $39,706.16 for each year through 2016 and $25,809.00 for .65 of the year 2017).[9]

6. Justice Ira Gammerman of the New York County Supreme Court apparently has become the judicial expert on the statutory scheme, no doubt in part because he wrote the first definitive opinion analyzing the statute and its method of computations in *Ursini v. Sussman,* 143 Misc.2d 727, 541 N.Y.S.2d 916 (Sup.Ct.N.Y.Co.1989), upon which most subsequent court decisions rely. (While *Ursini* concerned Article 50–A of the CPLR which applies to medical malpractice actions, the relevant provisions of Article 50–B are the same as those of 50–A. *Alisandrelli v. Kenwood,* 724 F.Supp. at 238–40; Siegel, "Practice Commentaries" to Article 50–B, p. 730 ("the two articles are, with minute exceptions … in every particular the same").) In a very recent opinion, *Andrialis v. Snyder,* Decision & Order (Sup.Ct.N.Y.Co.), printed in the New York Law Journal, January 26, 1993, p. 22–23, Justice Gammerman issued a further comprehensive opinion, discussing some of the errors courts have been making in the methods of computation and detailing the procedure he has determined should be followed.

7. Given the peculiar posture of this case and its lack of certain evidence or stipulations on which the computations are normally made (such as, simply to name two, the amount of attorney's fees incurred and to be incurred and current discount rates applied by insurance companies), my method has had to assume certain facts. I do believe, however, that the recommended amount fully comports with the intent of your Honor's Opinion and is fair and just to both the plaintiffs and the defendants.

8. I have used the date of entry of the default judgment, in September 1991, which established defendants' liability, as the "verdict" date.

9. There is a difference of opinion as to whether inflation may be taken into account in calculating future damages in reaching a verdict under §§ 4111(f) and 4213(b). Judge Stanton of this court has held that a jury should not take inflation into account at this stage because Article 50–B gives effect to that factor when the court enters a "structured judgment." *Alisandrelli v. Ken-*

■ I do not believe, however, that it would be appropriate to award this full future amount because it is based solely on the conclusion of Dr. Ellien (who is not a medical doctor) that plaintiff, now 32 years old, is totally disabled and will never again work during the remainder of his life. I do not find that the evidence supports such an assumption. Indeed, it is to the contrary. Plaintiff is a young man who used to maintain an active life. He is depressed staying home and finds it demeaning to be supported by his wife's salary. Although, to be sure, he will be unable to work in the construction industry or in any job requiring much mobility, I believe he will search out and be able to find work. He has full use of his upper body and would be able to do any type of desk work, albeit with pain from time to time in his back. Even if plaintiff were to be confined to a wheelchair in the future—which the evidence does not show—he would join the ranks of millions of other Americans so situated who are employed.[10] To the extent his opportunities are limited by his ninth-grade education as found by Dr. Ellien, he can certainly pursue further education. Dr. Ellien admitted when I asked at the inquest that plaintiff's job opportunities would be expanded if he received a high school diploma. To the extent Dr. Ellien's conclusion was also based on the difficulty encountered by the disabled in transportation and access to work places as she testified, the recently-enacted American with Disabilities Act gives

reason to believe such difficulties may be greatly reduced.[11] It is, therefore, questionable how much weight should be accorded Dr. Ellien's statistics as to numbers of people working in sedentary jobs based on the Census figures for earlier periods.[12] For these and other reasons, including some doubt as to plaintiff's testimony concerning the extent of his pain and including the fact that he will no doubt learn to adjust to his circumstances to some extent, I find that there is a good probability that he will be able to find work if he starts looking. I recognize, on the other hand, that he may not be always able to work at a full-time, eight-hour, five-day-a-week job, but instead may have to pursue part-time work. I conclude, based on the above, that the figure of $1,028,389.54 reached for lost future earnings should be reduced by fifty percent, to $514,194.77. *See Mesick v. State*, 118 A.D.2d 214, 504 N.Y.S.2d 279 (3d Dep't), *appeal denied*, 68 N.Y.2d 611, 510 N.Y.S.2d 1025, 502 N.E.2d 1007 (1986) (in case where teenage claimant suffered spinal cord injury which rendered him a permanent quadriplegic, Appellate Division reduced award for lost future earnings by an amount equivalent to 40% of what it was estimated he would have earned without the injury to reflect possible future earnings).

In sum, I find the awards for lost past and future earnings should be $66,176.93 and $514,194.77, respectively.

*wood*, No. 88 Civ. 8002 (LLS), 1990 WL 20158 at *1, 4 (S.D.N.Y. Feb. 27, 1990), *aff'd*, 923 F.2d 844 (2d Cir.1990). However, in more recent decisions, New York courts have held that inflation may be taken into account in determining the future damages. *Brown v. State*, 184 A.D.2d 126, 592 N.Y.S.2d 533, 534–35 (4th Dep't 1992); *Andrialis v. Snyder*, N.Y.L.J., January 26, 1993, p. 22; *Gambardelli v. Allstate Overhead Garage Doors, Inc.*, 150 Misc.2d 395, 576 N.Y.S.2d 770, 774 (Sup.Ct.N.Y.Co.1991). The assumptions of plaintiff's expert regarding inflation in her calculations are hardly clear, but insofar as plaintiff is content to use the same wage figure for each future year, it is certainly appropriate to do so. (Moreover, given the current economic climate and the somewhat precarious status of labor unions, many union workers have been seeing decreases in wages.)

10. The legislative history of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et*

*seq.*, Pub.L. 101–336, 104 Stat. 328 (July 26, 1990), estimated that six million disabled Americans between the ages of 16 and 64 (*i.e.*, one-third of all disabled Americans between those ages) were employed in 1990. H.R.Rep. (Educ. & Labor Comm.) No. 101–485(II) (May 15, 1990), *reprinted at* 1990 U.S.C.C.A.N. 267, 303, 314.

11. A central purpose of the ADA is to facilitate the movement of disabled persons into the work force. *See id.*, 1990 U.S.C.C.A.N. at 316.

12. Both Dr. Ellien and Dr. Andolino made special note that plaintiff is unable to drive a vehicle because he cannot operate the foot pedals and is thus limited in his ability to get to work or to do any work that would require driving. I reject this notion. People without any use of their lower extremities routinely drive by means of hand controls for gas and brake pedals.

*Pain and Suffering*

▮ Plaintiff seeks an award of $10,000,-000 for his past and future pain and suffering.[13] To be sure, plaintiff has suffered severe injuries that will most likely continue to cause pain in some degree for the rest of his life and restrict the type and quality of the life he will lead. An award for "pain and suffering" includes compensation not just for physical pain, but for emotional pain and for loss of enjoyment of the pleasurable activities of life. I believe, however, that the request of $10,000,000 is excessive based on the considerable body of precedent of awards by the courts in New York in injury cases.

In response to a directive by me at the inquest that plaintiff provide some support for his request in this amount, he has submitted excerpts from the "New York State Jury Verdict Review and Analysis" reporting the results in five personal injury cases:

> *Pirado v. Mullin*, $6,010,000 awarded for pain and suffering in September 1989 by a jury in Kings County;

> *Mayo v. Triboro Bridge & Tunnel Auth.*, $10,000,000 awarded in December 1989 by a jury in Bronx County;[14]

> *Kirschhoffer v. Van Dyke*, $7,325,000 awarded for pain and suffering in January 1990 by a jury in Orange County;

> *Franzese v. Hidy*, $1,150,000 awarded for pain and suffering in June 1990 by a jury in this court (White Plains);

> *Sweatland v. Sevenson Constr. Co.*, $1,500,000 awarded for pain and suffering in August 1990 by a jury in Erie County.

There appear to be no reported decisions in these cases except *Kirschhoffer* (*see* below), but my review of simply the "Jury Verdict Review and Analysis" pages submitted by plaintiff indicates to me that $10,000,000 would indeed be excessive in the circumstances of the instant case.

Initially it may be noted that in none of these cases submitted by plaintiff was the award as high as the one he requests for pain and suffering.[15] Assuming, as I do, that these five cases plaintiff submitted were the *best* he could find (*i.e.*, those with the highest awards), the difference between their awards and the much greater one which plaintiff seeks seems particularly significant. It may additionally be noted that the "Commentary" section which follows the report of each of these cases, apparently written by the editors of the New York State Jury Verdict Review and Analysis, denotes the fact that in these cases the awards were unusually large and goes on to analyze what strategy contributed to "a particularly large award," "an award of this magnitude," and "the size of the award." Moreover, plaintiff's reference to these cases to justify the size of the award he requests must be rejected because the facts in this case are not analogous to the facts in those cases. Thus, for example, in *Pirado* the plaintiff was a pedestrian waiting for a light to change when the defendant's speeding car mounted a barricade, traveled 50 feet and landed on plaintiff's legs, crushing them and pinning him under the car. The "Commentary" points out that the "unusual and traumatic nature of the incident ... when coupled with the totally innocent nature of the plaintiff, probably contributed to the magnitude of this award." The "Commentary" further notes that in addition to suffering the leg fractures, plaintiff there underwent four surgical operations, including revision of an amputated toe and arthritis in his knee, and required a muscle transplantation which left him with "horrendous scarring." Finally, the defendant in that case was a well-known player on a National Basketball Association team who, on post-trial motions, argued that the jury allowed such a large award because of his financial status. In *Mayo*, the plaintiff was injured all over his

---

13. Although New York law requires that an award specify what amount is for past pain and suffering and what amount for future so that the court can structure a proper judgment under Article 50–B, plaintiff has simply asked in conclusory fashion for this amount for both.

14. This amount appears to be a total award for all elements of damage, and what portion of it

represents pain and suffering alone is not ascertainable.

15. The smaller awards would not appear to be a function of the plaintiffs' ages vis-à-vis plaintiff here, since in the four of the five cases in which the plaintiffs' ages are noted, they are reported as 20, 28, 38 and 39.

body, including his face, which was left with permanent scarring. His eye had been dislodged from its socket by the accident, and it is probable that that plaintiff, a young man, will be ultimately confined to a wheelchair for the remainder of his life. In *Franzese*, apart from severe physical injuries, the plaintiff was left with significant permanent brain damage from the accident.

A review of recent cases yields the inescapable conclusion that plaintiff's request here for $10,000,000 for pain and suffering is greatly excessive and counsel's persistence in the request, when told he would be expected to provide some support, may even be sanctionable. Of particular note in this regard is the submission of the report of the $7,325,000 jury award in *Kirschhoffer v. Van Dyke*. Not mentioned by counsel here is that the trial court there reduced the award for pain and suffering to $2,825,000. (Moreover, the Appellate Division, after counsel's submission here, mandated a further reduction to $1,825,000 or a new trial on damages. *Kirschhoffer v. Van Dyke*, 173 A.D.2d 7, 577 N.Y.S.2d 512 (3d Dep't 1991).)

The Second Circuit has instructed us that "appellate courts have become increasingly willing to review damage awards ... [in] 'response to the increasingly outrageous amounts demanded by plaintiffs....'" *Nairn v. National R.R. Passenger Corp.*, 837 F.2d 565, 568 (2d Cir.1988) (quoting *Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 773 (3d Cir.1987)). There are, needless to say, hundreds of cases which help to place the instant case in context. Having undertaken a thorough review of awards in the New York courts, I find that an award of $1,200,000 to plaintiff to be most appropriate in this case.[16] Indeed, awards in this range generally involve injuries more severe than plaintiff's. *See, e.g., Chung v. New York City Transit Auth.*, 183 A.D.2d 741, 583 N.Y.S.2d 476 (2d Dep't 1992) (Appellate Division finds $3,445,000 for pain and suffering excessive to extent it exceeds $1,300,000 for plaintiff whose both legs were severed by subway train); *Policastro v. Savarese*, 171 A.D.2d 849, 567 N.Y.S.2d 784, 788 (2d Dep't 1991) ($1,000,000 for inju-

ries including brain damage causing permanent paralysis and requiring extensive treatment, permanent limp and eye damage resulting in double vision); *Pavia v. Rosato*, 154 A.D.2d 519, 546 N.Y.S.2d 140 (2d Dep't 1989) (Appellate Division finds $2,120,000 excessive to extent it exceeds $1,000,000 for injuries including permanent paralysis, spasticity of the left side and a severe speech impairment); *Kavanaugh v. Nussbaum*, 129 A.D.2d 559, 514 N.Y.S.2d 55 (2d Dep't 1987), *modified on other grounds*, 71 N.Y.2d 535, 528 N.Y.S.2d 8, 523 N.E.2d 284 (1988) (Appellate Division finds reduction of award for pain and suffering from $2,500,000 to $1,500,000 proper for infant plaintiff required to breathe through tracheotomy for first three years, whose cranial size, mental and physical development were severely impaired, and who suffered from hyperactivity, impaired motor functions and epileptic seizures); *Mesick v. State*, 118 A.D.2d 214, 504 N.Y.S.2d 279, 283 (3d Dep't), *appeal denied*, 68 N.Y.2d 611, 510 N.Y.S.2d 1025, 502 N.E.2d 1007 (1986) (Appellate Division finds award exceeding $1,000,000 excessive for 17–year–old plaintiff rendered permanent quadriplegic (representing 50% culpability)); *Le Bel v. Airlines Limousine Service, Inc.*, 92 A.D.2d 996, 461 N.Y.S.2d 474 (3d Dep't 1983) ($800,000 for pain and suffering and economic loss for plaintiff whose right leg was crushed and required amputation above the knee); *Kalofonos v. State*, 115 Misc.2d 692, 454 N.Y.S.2d 645, 653–54 (Ct.Cl.1982), *aff'd*, 104 A.D.2d 75, 481 N.Y.S.2d 415, 419 (2d Dep't 1984) ($525,000 for pain and suffering, loss of earnings and expenses for 32–year–old plaintiff who sustained permanent brain damage requiring over 25 hospitalizations and suffered permanent hearing loss, headaches, loss of balance, loss of memory, blurred vision and acute mental and emotional problems including inability to work, to read, to be with other people and physical abuse of wife and daughters). The award to Mr. Sales of $1,200,000 represents $300,000 for his past pain and suffering and $900,000 for future pain and suffering. *See, e.g., Chung v. New York City Transit Auth.*, 583 N.Y.S.2d at 477; *Cran-*

---

**16.** This amount assumes a life expectancy of 43.1 years based on the National Center for Health Statistics' Life Tables printed in 1 NY PJI2d Appendix A (1991 Supp.).

*ston v. Oxford Resources Corp.*, 173 A.D.2d 757, 571 N.Y.S.2d 733 (2d Dep't), *appeal denied*, 78 N.Y.2d 860, 576 N.Y.S.2d 219, 582 N.E.2d 602 (1991).

*Carol Sales*

■ Co-plaintiff Carol Sales requests an award of $3,000,000 for the loss of her husband's services. An award for loss of services must take into consideration not only "services," but also such elements as love, companionship, affection, society, and sexual relations, including the injured spouse's disposition and temperament and the social life, comfort and happiness of the members of the family. *See, e.g., Millington v. Southeastern Elevator Co.*, 22 N.Y.2d 498, 293 N.Y.S.2d 305, 239 N.E.2d 897 (1968); PJI 2:315. Taking into account Mrs. Sales' testimony and my own "observation, experience and knowledge," PJI 2:315, and based on a review of such awards in similar cases, I find that $215,000, representing $50,000 for the past and $165,000 for the future, should be awarded to Mrs. Sales. In *Kalofonos v. State, supra,* the case in which a 32-year-old man sustained permanent brain damage causing severe physical injuries and mental injuries resulting in, *inter alia,* his hitting his wife and daughters, his inability to be with people and inability to work, the wife was awarded only $25,000. In *Sweatland v. Sevenson Constr. Co.,* one of the cases submitted by plaintiff Mr. Sales to support his damages request, the plaintiff's wife similarly received only $25,000. While I believe $25,000 would not be adequate for Mrs. Sales, I find $215,000 fully adequate compensation. *See also Dauria v. City of New York,* 178 A.D.2d 289, 577 N.Y.S.2d 64 (1st Dep't 1991), *appeal denied,* 80 N.Y.2d 751, 587 N.Y.S.2d 287, 599 N.E.2d 691 (1992) (upholding finding of $150,000 damages for loss of wife's services where her fractured ankle resulted in permanent damage and pain and required amputation of two toes); *Gallo v. Supermarkets General Corp.,* 112 A.D.2d 345, 491 N.Y.S.2d 796 (2d Dep't), *appeal denied,* 66 N.Y.2d 605, 498 N.Y.S.2d 1025, 489 N.E.2d 770 (1985) (Appellate Division finds $300,000 proper for wife whose formerly healthy, athletic and social husband in his twenties suffered third degree burns and other injuries resulting in removal of ear, permanent and extremely disfiguring facial scars, improper functioning of eyelids and tear ducts and severe psychological and mental problems including inability to work, fear of contact with people, fear of hot liquids and inability to look in mirror); *Le Bel v. Airlines Limousine Service, Inc.,* 92 A.D.2d 996, 461 N.Y.S.2d 474 (3d Dep't 1983) ($100,000 to wife whose husband suffered crushed leg and required amputation).

*Requirements of Article 50–B*

Normally at this point in a case—when the jury or court has reached its assessment of damages—the parties would submit computations under the Article 50–B scheme to enable the court to enter the appropriate structured judgment. *See, e.g., In re Eastern & Southern Dists. Asbestos Litig.,* 772 F.Supp. 1380, 1412 (E. & S.D.N.Y.1991), *aff'd in part, rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig.,* 971 F.2d 831 (2d Cir.1992); *Rohring v. City of Niagara Falls,* 584 N.Y.S.2d at 515. These generally include evidence from economists and insurance experts as to the discount rates required to assess the current cost of the annuities necessary to pay the judgment. *See, e.g., Peterson v. Zuercher,* 152 Misc.2d 684, 584 N.Y.S.2d 968, 971 (Sup. Ct. Erie Co.1992). Here, however, defendants, of course, have not addressed the subject of damages and plaintiff has ignored the requirements of the statute. I have, accordingly, made my own computations.

As detailed above, plaintiff's lost past earnings total $66,176.93, and his compensation for past pain and suffering should be set at $300,000.00, for a total of past damages of $366,176.93. His future damages are lost earnings in the amount of $514,194.77 and pain and suffering in the amount of $900,000.00, for a total of future damages of $1,414,194.77. The next step we must take under the statute is to determine what percentage each of the two elements of future damages bears to the total award for future damages:

| | | |
|---|---|---|
| Earnings: | 514,194.77 ÷ 1,414,194.77 = | 36% |
| Pain and Suffering: | 900,000.00 ÷ 1,414,194.77 = | 64% |

Next, we apply the percentages to the $250,000.00 of future damages that are to be paid in the initial lump sum to determine what

amount of the $250,000.00 represents earnings and what amount represents pain and suffering:

| | |
|---|---|
| Earnings: | $250,000.00 \times .36 = 90,000.00$ |
| Pain and Suffering: | $250,000.00 \times .64 = 160,000.00$ |

We next deduct these amounts from the future damages amounts to determine the amounts of future damages remaining after payment of the $250,000.00 lump sum:

| | |
|---|---|
| Earnings: | $514,194.77 - 90,000 = 424,194.77$ |
| Pain and Suffering: | $900,000.00 - 160,000 = 740,000.00$ |

We now divide the future earnings figure of $424,194.77 by 25.9 years of work-life expectancy and the future pain and suffering figure of $740,000.00 by 10 years: [17]

$$424,194.77 \div 25.9 = 16,378.18$$
$$740,000.00 \div 10 = 74,000.00$$

Thus, the first year's payments of future damages comes to $16,378.18 representing earnings and $74,000.00 for pain and suffering, prior to our making the appropriate reductions for the immediate lump sum attorney's fee. The next series of calculations we must make is to increase each of these amounts by 4% per year, compounded annually, for the number of years over which the awards are to be made and then to reduce each year's amount by applying a discount rate.[18] We thus arrive at the total present

value of two annuity contracts needed to meet the awards for future earnings and future pain and suffering:

| | |
|---|---|
| Earnings: | $329,250.55$ |
| Pain and Suffering: | $662,573.80$ [19] |

However, we are not done. We must now allocate 33⅓% of each figure for the attorney's fee: [20]

| | |
|---|---|
| Earnings: | $329,250.55 \div 3 = 109,750.18$ |
| Pain and Suffering: | $662,573.80 \div 3 = 220,857.93$ |

and divide each attorney's fee figure over the number of years payments of damages are to be made:

$$109,750.18 \div 25.9 = 4,237.46$$
$$220,857.93 \div 10 = 22,085.79$$

We then deduct each result from the amount of the first year's payment calculated earlier to arrive at the real first year's payment to be made:

$$16,378.18 - 4,237.46 = 12,140.72$$
$$74,000.00 - 22,085.79 = 51,914.21$$

And there's more. We must now take each result and increase it by 4% and discount it by 6% for each year the award is to be paid to arrive at the total present value for an annuity contract for each item of future damages. Doing so, on the basis previously described, yields the following:

17. As mentioned earlier, although plaintiff's life expectancy is 43.1 years, the statute provides for a maximum period of 10 years for the pain and suffering payout.

18. The statute simply provides for use of "the discount rate in effect at the time of the award" (§ 5041(e)), and the cases appear to use various discount rates arrived at through various means. I have used a 6% discount rate. The range of rates established for February and March 1993 by the Secretary of the Treasury pursuant to 26 U.S.C. § 1274(d)(1)(B) for outstanding United States long-term obligations was 5.62% to 5.87%. Internal Revenue Bulletins 1993–5, 1993–10, Revenue Rulings 93–10, 93–19. Use of a rate close to that established by the Secretary appears appropriate (*see Peterson v. Zuercher,* 584 N.Y.S.2d at 971–72), and in his recent decision in *Andrialis v. Snyder* Justice Gammerman recommended the use of a rate of 6% (N.Y.L.J., January 26, 1993, pp. 22–23).

19. To calculate the present value of the annuities here I constructed a schedule of factors based on payment in the first year of $1.00, divided into equal monthly installments paid in advance, and

payments in subsequent years, also in equal monthly installments in advance, of $1.00 increased by 4% compounded annually. I then calculated the present value of each payment on the basis of a 6% discount rate. The present value of the 12 payments totalling $1.00 in the first year is $0.97404; the present value of the 12 payments in any particular year (where $y$ = the number of the year) is:

$$\$0.97404 \times \frac{(1.04)^{y-1}}{(1.06)^{y-1}}$$

The cumulative present value of payments over any given period is the factor for that period. Multiplying the factor for a given period by the actual first annual payment thus produces the present value of an Article 50–B annuity starting with that payment and continuing over the given period.

20. Neither plaintiff nor his counsel has submitted any evidence of their fee arrangement; I have used the maximum rate authorized for counsel by § 603.7(e) of the Rules of the Supreme Court, Appellate Division, First Department (22 N.Y.C.R.R. § 603.7(e)). *See also, e.g., Matter of Kritzer,* 146 Misc.2d 1050, 553 N.Y.S.2d 968 (Surr.Ct.N.Y.Co.1990).

Earnings: 244,064.89
Pain and Suffering: 464,824.26
—————
708,889.15

## CONCLUSION

Based on all of the above, I find that a judgment for plaintiffs' damages would be in the amounts of $1,891,607.76 for plaintiff Christopher Sales and $245,637.50 for plaintiff Carol Sales, for a total of $2,137,245.26, consisting of the following:

Christopher Sales:

| | |
|---|---|
| 366,176.93 | (Past damages) |
| 250,000.00 | (Future damages) |
| 330,608.11 | (Attorney's fees on remaining future damages) |
| 708,889.15 | (Present cost of annuities required for remaining future damages, excluding attorney's fees) |
| ————— | |
| 1,655,674.19 | |
| 235,933.57 | (Interest on the above from September 30, 1991 through April 30, 1993 at 9% per annum) [21] |
| ————— | |
| 1,891,607.76 | |

Carol Sales:

| | |
|---|---|
| 50,000.00 | (Past damages) |
| 165,000.00 | (Future damages) [22] |
| ————— | |
| 215,000.00 | |
| 30,637.50 | (Interest on the above) |
| ————— | |
| 245,637.50 | |

Accordingly, $2,137,245.26 is the amount of security defendants are required to post pursuant to your Honor's Opinion.

Copies of this Report and Recommendation have been mailed April 5, 1993 to the following:

Mark Krassner, Esq.

Cohen & Krassner

350 Fifth Avenue, Suite 2418

New York, New York 10118

Jeffrey H. Hirsch, Esq.

Sheft & Sheft

11 Broadway

New York, New York 10004

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court and send copies to the Honorable Charles S. Haight, Jr., to the opposing party and to the undersigned. Failure to file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Haight. *See* 28 U.S.C. § 636(b)(1); Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure; *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of HHS*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983) (per curiam).

Dated: New York, New York

April 5, 1993

---

21. Your Honor's Opinion (p. 11) specifically requires that the appropriate interest be included in the security to be posted. Moreover, as interest is a substantive right, we must follow the provisions of New York law (*see Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 93 (2d Cir.1984)), which provide for postverdict-prejudgment interest at the rate of 9%. *See Ursini v. Sussman*, 541 N.Y.S.2d at 920; N.Y.Civ.Prac.L. & R. §§ 5002, 5004 (McKinney 1992). I have chosen the April 30 cut-off date because under your Honor's January 26 Memorandum Order (p. 2) defendants are to post their security within 30 days of this Report and Recommendation, barring timely objections to it, or by May 5, 1993.

22. Because her future damages are less than $250,000, she is entitled to the full sum of $215,000 without further Article 50–B computations.